Charles S. LiMandri, SBN 110841
Paul M. Jonna, SBN 265389
Jeffrey M. Trissell SBN 292480
Robert E. Weisenburger, SBN 305682
LiMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938
cslimandri@limandri.com
pjonna@limandri.com
jtrissell@limandri.com
rweisenburger@limandri.com

Glenn B. Manishin (SBN 104001)
PARADIGMSHIFT LAW LLP
6735 Breezy Drive, Suite 101
Warrenton, VA 20187-2716
(202) 256-4600
(877) 666-5111 (fax)
glenn@manishin.com

Thomas Brejcha, *pro hac vice*\*
Peter Breen, *pro hac vice*\*
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
tbrejcha@thomasmoresociety.org
pbreen@thomasmoresociety.org
\*Application forthcoming

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REINTEGRATIVE THERAPY ASSOCIATION, INC., a California Corporation; and DR. JOSEPH NICOLOSI JR., an individual;<br><br>       Plaintiffs,<br><br>v.<br><br>DAVID J. KINITZ, an individual; and TRAVIS SALWAY, an individual,<br><br>       Defendants. | Case No.: **'21 CV1297 BEN BLM**<br><br>**COMPLAINT FOR:**<br><br>**1. DEFAMATION (LIBEL PER SE); AND**<br><br>**2. INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

-1-

Plaintiffs Reintegrative Therapy Association, Inc., a California Corporation, and Dr. Joseph Nicolosi Jr. allege as follows:

1.     Plaintiff Reintegrative Therapy Association, Inc., is a California corporation duly organized under the laws of the State of California.

2.     Plaintiff Dr. Joseph Nicolosi Jr. is an individual residing in the State of California.

3.     Plaintiffs are informed and believe that Defendant Dr. Travis Salway is, and at all times mentioned herein was, an individual residing in the Country of Canada in the province of British Columbia.

4.     Plaintiffs are informed and believe that Defendant David J. Kinitz is, and at all times mentioned herein was, an individual residing in the Country of Canada in the province of British Columbia.

## JURISDICTION & VENUE

5.     Pursuant to 28 U.S.C. § 1332, this Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties because complete diversity of citizenship exists between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.     Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because the defendants are not residents of the United States.

## THE PARTIES

7.     Plaintiff Reintegrative Therapy Association, Inc. ("Reintegrative Therapy Association") is a California 501(c)3 non-profit Corporation that offers training in Reintegrative Therapy® psychological services to mental health professionals who treat individuals seeking healing from addiction and trauma.

8.     Plaintiff Dr. Nicolosi is the founder and president of the board of the Reintegrative Therapy Association, and is a licensed clinical psychologist serving as the clinical advisor for the Reintegrative Therapy Association.

9.      Defendant Dr. Salway is, and at all times herein mentioned was, co-author of the article titled "The Scope and Nature of Sexual Orientation and Gender Identity and Expression Change Efforts: a Systematic Review Protocol," attached hereto as **Exhibit 1** (hereinafter the "Disputed Article").  *See* Kinitz, D.J., Salway, T., Dromer, E., et al., *The scope and nature of sexual orientation and gender identity and expression change efforts: a systematic review protocol*. Syst. Rev. 10, 14 (2021). https://doi.org/10.1186/s13643-020-01563-8 (emphasis added).

10.     Defendant Kinitz is and at all times herein mentioned was co-author of the Disputed Article.

11.     Plaintiffs are informed and believe that Dr. Salway and Mr. Kinitz are the lead co-authors of the Disputed Article and contributed equally to authorship of the work.  *See* Kinitz et al., *supra*, at 7 ("Authors' Contributions").  On that basis, Plaintiffs are informed and believe, and thereon allege that, at all times and places mentioned herein, Defendants and each of them, were the agents, servants, employees, partners, joint venturers, conspirators, and alter egos of the other Defendants, and each of them were at all times and places mentioned herein acting within the purpose and scope of such service, agency, employment, partnership, joint venture, and/or conspiracy. Plaintiffs are informed and believe that all of the wrongful acts alleged herein were authorized and/or ratified by the agents or employees of Defendants.  Consequently, Defendants are jointly and severally liable for any judgment rendered herein.

12.     All defendants are hereinafter collectively referred to as "Defendants."

## GENERAL ALLEGATIONS

13.     The Reintegrative Therapy Association was formed and founded by Dr. Nicolosi on or around June 13, 2017, for the purpose of educating the public and training professional therapists in the practice of Reintegrative Therapy.®  The Reintegrative Therapy Association maintains an ethics code concerning the practice of Reintegrative Therapy® and also holds exclusive rights to train and license qualifying clinical psychotherapists in the practice of Reintegrative Therapy®, which is a duly registered

certification trademark with the United States Patent and Trade Mark Office as registration No. 5771624.

14.    The Reintegrative Therapy® trademark covers goods and services through the Reintegrative Therapy Association and its licensed affiliates as follows:

> mental health therapy services, namely, an amalgam of trauma and addiction treatment interventions that treat affective dysregulation in order to assist in reintegration of thoughts, feelings and attachment needs which became split-off due to prior experiences of affective and relational dysregulation.

*See* Reintegrative Therapy®, U.S. Patent and Trade Mark Office, Registration No. 5771624.

15.    Reintegrative Therapy® does not seek to change a person's sexual orientation.    Rather, Reintegrative Therapy® uses evidence-based interventions designed to resolve traumas and addictions.   The treatment methods utilized in Reintegrative Therapy® are the same regardless of whether the client is a female client with a binge eating disorder or a male client with sexually compulsive behaviors.  While resolving a person's psychological trauma through Reintegrative Therapy® has a variety of secondary impacts on the individual's psychological dynamics, which sometimes include impacts on a person's sexuality, <u>Reintegrative Therapy® does not have as its treatment goal changing a person's sexual orientation</u>.

16.    Consequently, Reintegrative Therapy® may not accurately be characterized as a Sexual Orientation Change Effort, or as a Sexual Orientation and Gender Identity and Expression Change Effort, commonly referred to by the acronyms SOCE and SOGIECE or by the pejorative term "conversion therapy."  The terms SOCE, SOGIECE, and "conversion therapy" are all highly generalized, stigmatized terms used by journalists, transgender activists and some in the psychological field to refer to a wide array of therapy methods, including many discredited and pseudo-scientific practices, that are united by the common express goal "to deny and suppress the sexual orientations, gender identities, and/or gender expressions of sexual and gender

minorities." *See* Kinitz et al., *supra*, at 2.  SOCE, SOGIECE, and "conversion therapy" have historically been practiced by many unlicensed individuals and have unfortunately sometimes included invasive, obsolete or non-consensual "treatments" such as electric shock therapy, medication to suppress sex drive, and other forms of advice on repressing sexual tendencies.  As a result, a severe, negative stigma has developed regarding SOCE, SOGIECE, and "conversion therapy" methods, such that many gay and transgender activists, including the Defendants, are attempting to cause legislation to be enacted that would make SOCE, SOGIECE, and "conversion therapy" methods unlawful and even criminal.

17.    In or around September 2017, the Reintegrative Therapy Association published on its publicly accessible website information regarding the distinctions between Reintegrative Therapy® and "conversion therapy" including a chart highlighting the distinctions as follows:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

COMPLAINT FOR DEFAMATION AND INJUNCTIVE RELIEF



| | "Conversion therapy" | Reintegrative therapy® |
|---|---|---|
| **Definition** | No precise definition- broad, nonscientific term referring to attempts to change a person's sexual orientation | Specific, trademarked term referring to a therapy which uses evidence-based interventions designed to resolve traumas and behavioral addictions |
| **Attempts to change sexual orientation** | Yes. Sexual orientation change is the goal | No. Clients are not encouraged to try to change their sexual orientation, rather they resolve trauma and behavioral addictions using evidence-based treatment approaches. Changes in sexuality are a possible byproduct |
| **Available for** | Clients who wish to change their sexual orientation | Anyone with any sexuality who wishes to resolve trauma and behavioral addiction |
| **Qualifications for therapy provider** | None | Must be a clinical psychotherapist adhering to the Reintegrative Therapy Association's ethics code |
| **Ethics code** | None | Set forth by the Reintegrative Therapy Association |
| **Trademark** | None | Yes |
| **Licensing** | None. Any individual can be a "conversion therapist" | The Reintegrative Therapy Association, a 501(C)3 non-profit organization, has exclusive licensing rights for qualifying mental health practitioners |
| **Evidence-based interventions** | Incorporates non-scientific interventions | Employs specific evidence-based treatment interventions |
| **Who directs the therapy** | The client or the therapist chooses the therapeutic goals, depending on the treatment. | Clients choose their own therapeutic goals |
| **Employs aversion techniques (shame, pain or coercion)** | Sometimes | Never |
| **Empirical evidence of negative side effects** | Some. Reports vary | None |
| **Treatments are equally applied to clients of any gender or sexual orientation** | No | Yes. Treatment approaches are identical, regardless of the client's gender or sexuality |

COMPLAINT FOR DEFAMATION AND INJUNCTIVE RELIEF

18.    The foregoing information regarding Reintegrative Therapy®, and the above chart, have been publicly accessible at https://www.reintegrativetherapy.com/reintegrative-therapy since the date of publication in or around September 2017.

19.    The Reintegrative Therapy® Standards for Practitioners established August 1, 2017, provide as follows:

**Reintegrative Therapy®
Standards for Practitioners
August 1, 2017**

These certification standards have been established by The Nicolosi Trust (Trust) and set forth the criteria by which the Trust evaluates applications by psychotherapy and psychological therapist candidates to become certified to use the trademark "Reintegrative Therapist" in their interactions with clients and patients. These certification standards are reviewed regularly to ensure that they deliver the objective of effective, voluntary therapy for individuals.

Use of the Reintegrative Therapy® mark is conditioned on a candidate (1) satisfying these certification standards, and (2) agreeing to the non-discriminatory licensing terms and conditions under which the Trust permits use of the mark (and any additional marks the Trust may adopt in the future) in connection with delivery by therapists, psychology counselors, clinical psychologists and psychiatrists of psychotherapy and psychological services.

**1.    Academic and Professional Qualifications.** Candidates for certification must demonstrate that they are individuals who (a) hold a master's degree or higher in counseling or a closely related field from a college or university that was accredited when the degree was awarded by one of the regional accrediting bodies recognized by the Council for Higher Education Accreditation, and (b) are actively engaged in a therapeutic or psychotherapy practice. Acceptable degrees include MSWs in Social Work or Counseling Psychology, University-based Ph.D. degrees in clinical psychology, Psy.D. degrees, counseling psychology Ed.D. degrees, LMHCs and M.D. degrees with additional certification by the American Board of Psychiatry and Neurology. Candidates agree that their professional qualifications, including their moral and ethical standing in

the profession and their competence in therapeutic skills, will be evaluated by the Trust, and that Trust's good faith judgment concerning such matters will be final. The evaluation of a candidate's therapeutic or clinical competence and moral and ethical behavior will be made by the Trust in its sole discretion, with due regard to the right of candidates to submit any and all information, documents or opinions in support of their qualifications.

**2.    Training.** Candidates must have successfully completed training in Reintegrative Therapy® by Dr. Joseph Nicolosi, Jr. or a Trust-approved member of the Reintegrative Therapy Association. All Reintegrative Therapy® Practitioners must, in addition, maintain their continuing professional education by participating annually in therapeutic classes and seminars presented or approved by the Trust.

**3.    Therapeutic Principles.** Candidates must agree with, endorse and pledge to follow the Four Principles of Reintegrative Therapy® (RT), included as an Exhibit A to these standards, in their interactions with clients and patients. Candidates are expected to abide by the RT Principles in both letter and spirit. It is not permissible to use for a candidate or certified professional to use the trademark "Reintegrative Therapist" in promotional materials, therapeutic sessions or public comments in a way that misleads clients, patients or the general public into thinking that Reintegrative Therapy® is a type of so-called "conversion therapy," is a cure to homosexuality, that homosexuality is a disease or that it may properly be administered involuntarily or otherwise without the informed consent of the client or patient. All references to Reintegrative Therapy® must assure respect for the client or patient and must be consistent with the highest ethical parameters for treatment and educational interventions.

**4.    Recertification.** Reintegrative Therapists must renew their eligibility by submitting an acceptable recertification application to the Trust, including a representation that they satisfy and have abided by these standards in their professional activities, at least every two (2) years.

**5.    Confidentiality Policy.** The Trust reserves the right to disclose information it possesses about any candidate or individual whom it judges has violated Trust rules, engaged in misrepresentation or unprofessional behavior, or shows signs of impairment.

/ / /

**7.   Revocation of Certification.** The Trust may, at its discretion, rescind a certification if the candidate was not qualified to receive the certification at the time it was issued, even if the certification was issued as a result of a mistake on the part of the Trust.

**8.   Unauthorized Use.** Candidates must acknowledge that if they engage in any unauthorized use or reference to the "Reintegrative Therapy®" or "Reintegrative Therapist" mark, their right to continue using the trademark may be terminated.

**9.   Reservation of Rights.** Except for the license rights under the Trust's terms and conditions for licensing use of the "Reintegrative Therapy" mark, the Trust reserves to itself all right, title and interest in and to that certification trademark.

## Exhibit A

**The Four Principles of Reintegrative Therapy®**
The four principles of RT are (1) the therapist's disclosing of his own views; (2) encouragement of the client's open inquiry; (3) resolving past trauma; and (4) education regarding associated features of trauma and addiction.

**(1) Disclosing versus imposing**
From the very start of therapy, the RT psychotherapist should disclose his views on trauma and sexual addiction, not only as a scientist-practitioner but also his views from a personal, philosophical or religious perspective, when appropriate. The RT client needs to be clear about the therapist's understanding of homosexuality as, for some individuals, possibly be an adaptation to childhood trauma experiences and as often representing a reintegrative behavior with sometimes serious future consequences. At the same time, the therapist must not impose those views on his client, but give him space to explore his own sexual identity and make his own self-determination. The RT therapist must not pressure or manipulate the client to believe or accept the same viewpoint as he does. Indeed, the therapist accepts and values the client as a person, no matter what his sexual orientation, behavior or self-label. The Reintegrative Therapy Association does not refute or attempt to change the American Psychological Association's and American Psychiatric Association's diagnostic categories regarding sexuality.

/ / /

**(2) Encouraging Inquiry**

While the client may be motivated to enter RT to reduce his unwanted sexual attractions, the RT therapist focuses on treating underlying trauma, neglect or sexual addiction with evidence-based psychotherapy interventions. The RT psychotherapist invites and encourages the client to inquire. He is encouraged to ask questions of himself, and to look into his feelings, wants and desires that may lie beneath his sexual attractions.

This brings us to another important rule of RT: The therapeutic alliance must include the mutual understanding that the client can always feel free to disagree with the therapist.

**(3) Resolving Past Trauma**

Trauma may be explicit, such as sexual or emotional abuse, or implicit in the form of negative parental messages regarding one's self and gender. Exploring, identifying and resolving these childhood emotional wounds using established, evidence-based trauma resolution methods can in some clients, regardless of their sexual orientation, result in a reduction of their sexually addictive behaviors. The same trauma resolution methods are available to Reintegrative Therapy® clients, regardless of their race, gender or sexual orientation.

**(4) Education**

It is the responsibility of the therapist not to withhold information that can be of use to the client. What the client does with that input is left for him to decide. As part of his discernment process, the client deserves to know the long-term medical and emotional liabilities associated with addictive sexual activities, including relevant potentially maladaptive behavioral patterns. The timing and manner of delivery of these educational opportunities should be determined by the RT psychotherapist's sensitivity to the client and when it is in the client's best interest.

(*See* https://www.reintegrativetherapy.com/practice-guidelines.)

20.   On or around January 8, 2021, the Defendants caused the Disputed Article to be published in the "Systematic Reviews" journal, which is an online-only open access medical journal published by BioMed Central ("BMC"). The Disputed Article contains the following false and defamatory statements:

/ / /

"What are conversion therapy and SOGIECE?

"Conversion therapy," sometimes referred to as "reparative therapy," *"reintegrative therapy,"* or "reorientation therapy," **refers to a set of pseudo-scientific, discredited practices that aim to deny and suppress the sexual orientations, gender identities, and/or gender expressions of sexual and gender minorities (SGM).** Conversion therapy ranges from talk-"therapies" to invasive treatments such as eclectic [sic] shock therapies [1].

…

SOGIECE are ineffective, harmful, and often lead to poor psychosocial outcomes. For example, SOGIECE have been associated with poor self-esteem, internalized stigma and discrimination, self-harm, self-hatred, depression, anxiety, and adaptive substance use (i.e., as a form of coping or suppression) [2, 14]. More generally, SOGIECE can lead to isolation from both communities of origin and SGM [sexual and gender minorities] communities, as many survivors of SOGIECE feel that they have lost years of their lives and are not able to embrace their authentic selves [12, 15]. Most alarmingly, it is estimated that over a third of those who experience SOGIECE attempt suicide [2], a statistic that does not capture those who have died of suicide."

*See* Kinitz et al., *supra*, at 2-3. (emphasis added).  Hereinafter, the foregoing quoted text shall be referred to as the "Disputed Allegation."

21.     The Disputed Article outlines the scope and method of a purported systematic review study of all SOCE, SOGIECE, and "conversion therapy," with an express goal of providing "evidence for countries considering or implementing federal, provincial, or municipal bans on SOGIECE."  *See* Kinitz et al., *supra*, at 7.

22.     The Disputed Allegation is false and defamatory for the following reasons:

23.     First, Reintegrative Therapy® is not "SOGIECE" or "conversion therapy." Unlike SOGIECE and "conversion therapy," Reintegrative Therapy® does not "aim to deny and suppress the sexual orientations, gender identities, and/or gender expressions of sexual and gender minorities."  Instead, the sole aim of Reintegrative Therapy® is treatment of trauma and addiction as noted in the chart at paragraph 17 above.

Additionally, the ethical and certification requirements of Reintegrative Therapy® practitioners expressly require, among other things, that (1) the practitioner "give [the patient] space to explore his own sexual identity and make his own self-determination," (2) that "the [Reintegrative Therapist] must not pressure or manipulate the client to believe or accept the same viewpoint as [the therapist]," (3) "the therapist accepts and values the client as a person, no matter what his sexual orientation, behavior or self-label."[1]  In sum, the express goal of Reintegrative Therapy® is resolution of trauma and addiction, not changing sexual orientation, and the applicable ethical and certification requirements prohibit a practitioner from pressuring or manipulating a patient to deny or suppress sexual orientation, gender identity, and/or gender expression.

24.    Second, Reintegrative Therapy® is not a "pseudo-scientific, discredited practice."  To the contrary, Reintegrative Therapy® is a trademarked term that may only be used by properly qualified, licensed affiliates of the Reintegrative Therapy Association, which in turn regulates the qualifications, ethics, training, and certification of its licensees.  In order to qualify for Reintegrative Therapy® licensure, psychiatric or psychological health professionals must hold a master's degree or higher in counseling or a closely related field and must be actively engaged in a counseling or psychotherapy practice.  Additionally, to begin practicing Reintegrative Therapy®, practitioners must complete 8 lecture hours in Reintegrative Protocol and Dynamic Assertion Protocol, 6 hours of supervised practice, 10 hours of clinical consultation, and receive a passing score of 70% on the basic training assessment.  In order to become a certified Reintegrative Therapist®, practitioners must complete the basic training and must also become EMDR trained,[2] must complete a Feeling State workshop, must complete 10 hours of individual Consultation with a Reintegrative Therapist®, must practice 350

---

[1] The quoted material from this paragraph has been publicly available since 2017 at the following link: https://www.reintegrativetherapy.com/practice-guidelines.

[2] EMDR is an acronym for Eye Movement Desensitization and Reprocessing, which is a form of psychotherapy treatment that was designed to alleviate the distress associated with traumatic memories.

hours of Reintegrative Therapy® with clients, must provide two letters of recommendation from licensed mental health practitioners, must register with the Reintegrative Therapy Association, and must Adhere to the Reintegrative Therapy Association Practice Guidelines.  Reintegrative Therapists® must re-certify every two years.[3]  In sum, Reintegrative Therapists® are properly educated, trained mental health practitioners specializing in trauma and addiction resolution, with a particular emphasis on resolving trauma and addiction related to sexuality.  Reintegrative Therapy® is not discredited or pseudo-scientific; Defendants' statement in this regard is false.

25.    Third, in so far as Reintegrative Therapy® is falsely grouped by the Defendants with SOGIECE, the overly-broad statement that "SOGIECE are ineffective, harmful, and often lead to poor phycological results" is false and defamatory as to Reintegrative Therapy®, which uses evidence-based counseling methods to treat unwanted sexual attraction, addiction, and trauma with proven, positive, and healthy results in many patients.  In addition, by falsely grouping Reintegrative Therapy® with SOGIECE, Defendants have falsely implied that Reintegrative Therapy® creates harmful effects of "poor self-esteem, internalized stigma and discrimination, self-harm, self-hatred, depression, anxiety, and adaptive substance abuse" as well as "isolation," "[losing] years of their lives," "attempt[ed] suicide," and even "[death from] suicide." Defendants have not cited a single study of Reintegrative Therapy® in the Disputed Article and, more specifically, have not cited any studies of Reintegrative Therapy that would provide a reasonable basis for concluding that the claimed negative effects of conversion therapy may accurately be associated with Reintegrative Therapy®.

26.    Reintegrative Therapy® has not been shown to have any of the foregoing negative harmful effects.  Defendants' association of Reintegrative Therapy® with these harmful, negative effects is false and defamatory.  Indeed, the citation supporting the

---

[3] Much of the information concerning licensing requirements for the Reintegrative Therapy Association from this paragraph has been publicly available since 2017 at the following link: https://www.reintegrativetherapy.com/practice-guidelines.

alleged statement about Reintegrative Therapy® does not even mention the term "Reintegrative Therapy®," falsely representing the cited source and, thereby, evidencing that Defendants consciously and deliberately added the term "Reintegrative Therapy" with the intent of harming Plaintiffs.

27.    In addition, Defendants are political activists, not independent researchers as suggested by the Disputed Article, who actively advocate for the criminalization of SOCE, SOGIECE, and "conversion therapy."  In an article published March 12, 2020, on "The National Interest" (https://nationalinterest.org/blog/buzz/how-i-ended-conversion-therapy-131702), Defendant Kinitz acknowledged a personal competing interest in the topic stating that he was a "survivor of conversion therapy" and advocating that "conversion therapy should be criminalized."  In a presentation on or around April 13, 2021, for "Innovations in Research: Towards Equity," Dr. Salway acknowledged that he is an advocate of bill C-6 in Canada, which seeks to criminalize "conversion therapy."  Dr. Salway also noted in his presentation that the C-6 bill does not go far enough and that he testified before the Canadian House of Commons, Standing Committee on Just and Human Rights to this effect.

28.    Defendants' political activism reveals a material conflict of interest, bias, and prejudice regarding the subject matter published in the Disputed Article, which are not disclosed in the Disputed Article and which tend to result in greater damage to Plaintiffs' reputation.  Notably, the failure to disclose personal and political conflicting interests also violates the BMC editorial policies, which require authors to disclose such conflicts.  Instead of providing the required disclosure, Defendants provided a false attestation clause stating, "the authors declare that they have no competing interests." *See* Disputed Article p. 7.  Additionally, this article will become a permanent part of scholarly record that will undoubtedly be cited by future journal articles, graduate students, courts and legislatures as authoritative — which it plainly is not — resulting in further damaging Plaintiffs' reputation in the years to come.  In fact, the Disputed Article has already been cited in the following article: McCann, E., Donohue, G., &

Brown, M. (2021). Experiences and Perceptions of Trans and Gender Non-Binary People Regarding Their Psychosocial Support Needs: A Systematic Review of the Qualitative Research Evidence. International Journal of Environmental Research and Public Health, 18(7), 3403. MDPI AG. Retrieved from http://dx.doi.org/10.3390/ijerph18073403.  In sum, publishing false and defamatory statements under the auspice of an independent, peer reviewed medical journal without disclosing personal and political conflicts of interest in the subject matter substantially increases the damage caused by the defamatory statements.

### Malicious Intent

29.   On information and belief, the Defendants published the false and defamatory Disputed Allegation maliciously with intent to injure and harm Plaintiffs. Defendants either knew the Disputed Allegation contained false and defamatory statements regarding Reintegrative Therapy®, or lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the Plaintiffs' rights.  The Reintegrative Therapy Association and Dr. Nicolosi hold the exclusive rights to use and license the trademarked terms Reintegrative Therapy® and Reintegrative Therapist®, which have only been recently introduced to the mental health field in 2017.

30.   A simple Google search of the term "Reintegrative Therapy" produces the Reintegrative Therapy Association website (https://www.reintegrativetherapy.com) as the first search result.  Since 2017, the website has provided easily accessible public information on the distinction between Reintegrative Therapy® and "conversion therapy," including the distinction that Reintegrative Therapy® does not have as its therapeutic goal changing a person's sexual orientation.  Additionally, during the same time frame, the website (https://www.reintegrativetherapy.com/practice-guidelines) has provided public information concerning the significant education, training, and ethical requirements that must be met to obtain and maintain a Reintegrative Therapy® license. Defendants either conducted due diligence regarding Reintegrative Therapy® prior to

publishing the Disputed Article, and thus knowingly published false statements regarding Reintegrative Therapy® as described above, or recklessly published the false statements by failing to perform any due diligence into the distinctions between Reintegrative Therapy® and SOGIECE/"conversion therapy." These intentional and/or reckless statements and failure to diligently inquire also fall below the due diligence standards for this profession and directly contradict Defendant's claims that the Disputed Article is a systematic review study based on accurate research and analysis

31.  Additionally, as Reintegrative Therapy® is trademarked by Dr. Nicolosi and is strictly licensed through the Reintegrative Therapy Association, Defendants cannot have been aware of the term "Reintegrative Therapy®" for purposes of publishing it in the Disputed Article without being aware that the term directly implicates the Reintegrative Therapy Association and Dr. Nicolosi.

32.  Finally, on or around April 30, 2021, Plaintiffs sent a retraction letter to Defendants informing them of the distinction between Reintegrative Therapy® and "conversion therapy" and requesting that Defendants withdraw their false and defamatory statements regarding Reintegrative Therapy®. Defendants have failed to comply with Plaintiffs' retraction request and have provided no response to Plaintiffs. In particular, Defendants have not indicated that they will withdraw their defamatory statements for purposes of the future proposed study discussed in the Disputed Article.

33.  Furthermore, even after receiving the retraction letters, Defendants have continued to publish statements that negatively characterize SOGIECE and by implication Reintegrative Therapy®, which Defendants have falsely grouped as a form of SOGIECE in the Disputed Article.

34.  Consequently, the Defendants published the false and defamatory Disputed Allegation maliciously, with knowledge it was false or reckless disregard of whether it was true or false, and, on information and belief, with intent to injure and harm Plaintiffs.

35.  Plaintiffs hereby demand trial by jury in this action.

## FIRST CAUSE OF ACTION

## DEFAMATION (LIBEL PER SE)

### All Plaintiffs Against All Defendants

36.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth herein above.

37.     As alleged herein, within one year of the filing of the instant action, Defendants and each of them authored and caused to be published the Disputed Article and the Disputed Allegation.

38.     As discussed in more detail above, the Disputed Allegation contains false and defamatory statements summarized as follows: (1) Reintegrative Therapy® is "conversion therapy"/SOGIECE, which is false; (2) Reintegrative Therapy®, as a form of "conversion therapy"/SOGIECE, is pseudo-scientific and discredited, which is false; and (3) Reintegrative Therapy®, as a form of "conversion therapy"/SOGIECE, causes various harmful effects to patients including depression, substance abuse, attempted suicide, and death by suicide, which is also false.

39.     The Disputed Article and Disputed Allegation were published to those other than Plaintiffs, and in fact anyone in the public at large using the internet was and still is able to discover and read the Disputed Article and Disputed Allegation.

40.     The Disputed Article and Disputed Allegation are "of and concerning" the Plaintiffs by clear implication.   The Disputed Allegation directly uses the term Reintegrative Therapy®.   Reintegrative Therapy® is a form of mental health therapy developed exclusively by Dr. Nicolosi.   Dr. Nicolosi runs the promotion and development of Reintegrative Therapy® through the Reintegrative Therapy Association, which was formed for the purpose of educating the public on sexual fluidity and Reintegrative Therapy® methods.   Dr. Nicolosi runs an active Reintegrative Therapy® mental health practice and has expended substantial resources in developing and promoting Reintegrative Therapy.®   Dr. Nicolosi is working on studies related to Reintegrative Therapy.®   He is actively involved in public promotion of Reintegrative

-17-

Therapy® through media interviews and other forms of public promotion.  Dr. Nicolosi and the Reintegrative Therapy Association have trademarked the term Reintegrative Therapy®, and have the exclusive right to brand, develop, market, and license the term Reintegrative Therapy®.  Indeed, familiarity with the term Reintegrative Therapy® necessarily implies knowledge of and familiarity with Dr. Nicolosi and the Reintegrative Therapy Association.  Consequently, the false Disputed Allegations regarding Reintegrative Therapy® necessarily must be understood as referring to Plaintiffs by clear implication.  Additionally, William Stanus, a Canadian therapist with whom the Plaintiffs are familiar, read the Disputed Article and Disputed Allegation and understood them as referring to Plaintiffs.  Laura Haynes, a licensed clinical psychologist living in California, also read the Disputed Article and Disputed Allegations and understood them as referring to Plaintiffs.

41.  The Disputed Article and Disputed Allegation tend to harm Plaintiffs' reputation and image on their face (i.e., they constitute libel per se) in that the Disputed Allegation falsely imputes on Plaintiffs' Reintegrative Therapy® trademark and mental health practice, the severe, negative stigma associated with "conversion therapy"/SOGIECE and falsely defames Reintegrative Therapy® as being a pseudo-scientific and discredited form of therapy that causes harmful effects to patients including, among other effects, depression, substance abuse, attempted suicide, and death by suicide.  These false and negative imputations reasonably and naturally have the effect of bringing Plaintiffs' trademarked Reintegrative Therapy® practice into public contempt, and of making it odious in the estimation of those with whom Plaintiffs have their business dealings and connections.

42.  Additionally, the defamatory Disputed Article and Disputed Allegation caused past and ongoing severe harm to Plaintiffs because the primary purpose of the Disputed Article and proposed research efforts is to "inform ongoing and new legislative efforts to ban SOGIECE and other interventions that aim to stem SOGIECE practices." *See* Kinitz et al., *supra*, at 1.  As Defendants' article states, "[o]ver the past year,

numerous national, regional, and local governments have introduced legislation to ban SOGIECE." *See* Kinitz et al., *supra*, at 2. In sum, the Disputed Article and Disputed Allegation falsely characterize Reintegrative Therapy® as SOGIECE, thereby creating a substantial peril that proposed legislation will ban Reintegrative Therapy® based on the false premise that Reintegrative Therapy® is a form of SOGIECE. Plaintiffs have expended substantial resources in developing the Reintegrative Therapy® trademark, building a Reintegrative Therapy practice, and in promoting it to other mental health practitioners for licensure. There is a cognizable risk that Plaintiffs' Reintegrative Therapy® practice may be criminalized in the near future because Defendants' false and defamatory Disputed Allegation characterizes Reintegrative Therapy® as "SOGIECE." This cognizable risk represents serious harm to Plaintiffs' business and the Reintegrative Therapy® trademark.

43. Defendants' publication of the Disputed Article and Disputed Allegation did, in fact, directly and proximately result in the following: (i) harm to Plaintiffs' business, trade, profession, and occupation; (ii) emotional distress on behalf of Dr. Nicolosi; (iii) harm implied and assumed by law; and (iv) other harm as elaborated herein in particular as elaborated in paragraphs 41 and 42 above.

44. As a direct and proximate consequence of such libel *per se* alleged in this Cause of Action, Plaintiffs have all been generally, specially, and consequentially damaged in an amount to be proven at trial and exceeding the jurisdictional minimum of $75,000.

45. As elaborated in more detail above at paragraphs 29 to 34, the aforementioned libel *per se* was committed with malice, with knowledge of its falsity or reckless disregard of its falsity, and, on information and belief, was committed willfully and intentionally and by means of oppression, fraud, and malice and in conscious disregard of Plaintiffs' rights. Therefore, the Disputed Article and Disputed Allegation are unprivileged. Additionally, Plaintiffs are entitled to an award of

/ / /

exemplary or punitive damages under Civil Code section 3294 in an amount to be established at trial.

46.     Defendants' libel *per se* alleged herein, unless enjoined by a preliminary injunction order and a permanent injunction judgment of this Court, will continue to cause great and irreparable injury to Plaintiffs.  Plaintiffs have issued retraction requests to Defendants, which have been ignored.  In the Disputed Article, Defendants have stated that they propose to conduct and publish future studies of SOGIECE.  Unless Defendants are enjoined from making future false and defamatory publications concerning Plaintiffs and Reintegrative Therapy®, these future publications will contain defamatory statements that repeat the defamatory, false statements made in the Disputed Article regarding Reintegrative Therapy® as a form SOGIECE.  As alleged herein, Plaintiffs have no adequate remedy at law for injuries that they are currently suffering and are threatened to be suffered from Defendants' libel *per se*.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants and request the following relief:

1. For general, special, and consequential damages against Defendants in a total sum to be proven at trial exceeding $75,000;

2. For punitive and exemplary damages under California Civil Code section 3294 in an amount to be established at trial and as the jury may deem just and proper;

3. For costs and expenses of suit;

4. For a preliminary and permanent injunction enjoining Defendants from engaging in defamation as alleged herein.

5. For such other and further relief as the Court may deem just and proper.

/ / /

/ / /

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

LiMANDRI & JONNA LLP

Dated: July 20, 2021

By: _____

Charles S. LiMandri
Paul M. Jonna
Jeffrey M. Trissell
Robert E. Weisenburger
Attorneys for Plaintiff

COMPLAINT FOR DEFAMATION AND INJUNCTIVE RELIEF

**EXHIBIT 1**

Kinitz et al. Systematic Reviews        (2021) 10:14
https://doi.org/10.1186/s13643-020-01563-8

# Systematic Reviews

**PROTOCOL**                                    **Open Access**

# The scope and nature of sexual orientation and gender identity and expression change efforts: a systematic review protocol



David J. Kinitz[1†] , Travis Salway[2,3,4*†], Elisabeth Dromer[5,6], Dean Giustini[7], Florence Ashley[8], Trevor Goodyear[9], Olivier Ferlatte[5,6], Hannah Kia[10] and Alex Abramovich[1,11]

## Abstract

**Background:** Sexual orientation and gender identity and expression change efforts (SOGIECE) are a set of scientifically discredited practices that aim to deny and suppress the sexual orientations, gender identities, and/or gender expressions of sexual and gender minorities (SGM). SOGIECE are associated with significant adverse health and social outcomes. SOGIECE continue to be practiced around the world, despite denouncements from professional bodies and survivors, as well as calls for legislative advocacy to prohibit SOGIECE and protect SGM. There are substantial gaps in the availability of consolidated international research to support and refine legislative proposals related to SOGIECE, including those currently underway to enforce bans in Canada and elsewhere.

We therefore propose the first systematic review of international data on SOGIECE that will outline the scope and nature of these practices worldwide. Specifically, we aim to estimate how many SGM have been exposed to SOGIECE, which sub-groups of SGM experience higher rates of SOGIECE, and how estimates of SOGIECE vary over time and place. In addition, we aim to describe when, where, how, and under what circumstances SGM are exposed to SOGIECE.

**Methods:** To locate an interdisciplinary swath of papers, nine (9) bibliographic databases will be searched: Medline (OVID), Embase (OVID), PsycInfo and Social Work Abstracts via EBSCO, CINAHL, Web of Science Core Collection, LGBTQ+ Source, and Proquest Dissertations & Theses Global and Sociology Collection (ProQuest). A gold standard search will be developed for Medline and adapted to the other databases. Grey literature will be searched at relevant websites, and reference harvesting will be performed in relevant SOGIECE scientific consensus statements. Two authors will independently screen abstracts/titles, screen full texts, abstract data, and apply risk of bias assessments. A narrative synthesis will be implemented to summarize findings.

**Discussion:** This review will address the gap in synthesized data regarding the prevalence of SOGIECE, social correlates of SOGIECE, variations of SOGIECE over time and place, and the circumstances, settings, and time-points of SOGIECE exposure. Findings from this review will directly inform ongoing and new legislative efforts to ban SOGIECE and other interventions that aim to stem SOGIECE practices and support SOGIECE survivors.

*(Continued on next page)*

* Correspondence: travis_salway@sfu.ca
†David J. Kinitz and Travis Salway contributed equally to this work.
²Faculty of Health Sciences, Simon Fraser University, Blusson Hall 10506; 8888
University Dr., Burnaby, B.C. V5A 1S6, Canada
³British Columbia Centre for Disease Control, Vancouver, Canada
Full list of author information is available at the end of the article



© The Author(s). 2021 **Open Access** This article is licensed under a Creative Commons Attribution 4.0 International License, which permits use, sharing, adaptation, distribution and reproduction in any medium or format, as long as you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons licence, and indicate if changes were made. The images or other third party material in this article are included in the article's Creative Commons licence, unless indicated otherwise in a credit line to the material. If material is not included in the article's Creative Commons licence and your intended use is not permitted by statutory regulation or exceeds the permitted use, you will need to obtain permission directly from the copyright holder. To view a copy of this licence, visit http://creativecommons.org/licenses/by/4.0/. The Creative Commons Public Domain Dedication waiver (http://creativecommons.org/publicdomain/zero/1.0/) applies to the data made available in this article, unless otherwise stated in a credit line to the data.

(Continued from previous page)

**Systematic review registration:** Registration with PROSPERO can be found under the registration number: CRD42020196393.

**Keywords:** Conversion therapy, Systematic review, Sexual orientation and gender identity and expression change efforts, Lesbian, gay, bisexual, transgender, and queer (LGBTQ)

## Introduction

### Background and rationale

#### What are conversion therapy and SOGIECE?

"Conversion therapy," sometimes referred to as "reparative therapy," "reintegrative therapy," or "reorientation therapy," refers to a set of pseudo-scientific, discredited practices that aim to deny and suppress the sexual orientations, gender identities, and/or gender expressions of sexual and gender minorities[1] (SGM). Conversion therapy ranges from talk-"therapies" to invasive treatments such as eclectic shock therapies [1]. Given the variability in how conversion therapy is articulated and practiced, a fulsome examination requires a broad definition. To capture the breadth of conversion therapy-related practices, such as a youth speaking to a counsellor who provides advice on repressing sexual attraction, a physician prescribing medication to suppress sex drive, or intentional delay of gender non-affirming care to a transgender (trans) or non-binary person, this project uses the phrase sexual orientation and gender identity and expression change efforts (SOGIECE) [2]. This definition includes, but is not limited to, more formal practices of conversion therapy. SOGIECE settings include religious sites, private and unregulated counsellor's offices, businesses, and licensed healthcare professional offices, among others [3–5]. Despite the increasing marginalization of professional-conducted SOGIECE in recent years, particularly for gender identity and expression change efforts, many healthcare professionals lack training and support to deliver gender-affirming care and may seek ways to deter their patients from transitioning from the gender aligned with their sex assigned at birth [6–11]. Accordingly, our definition of SOGIECE includes practices that delay transition for trans and non-binary people.

### The prevalence of SOGIECE:

SOGIECE continue to occur across the globe, including jurisdictions with strong legal protections for SGM, such as Canada [2, 12]. To-date, no attempts have been made to synthesize quantitative prevalence estimates (i.e., using a systematic review methodology). Recent Canadian data estimate that, as of 2019, 20% of sexual minority men have been exposed to SOGIECE and 8% have

experienced more circumscribed "conversion therapy" practices [1]. In addition, a 2019 Canadian survey with trans people estimated that 11% have experienced conversion therapy at some time in their lives [13], likely a low estimate given the narrower definition used. In the United States (US), empirical data suggest a lifetime prevalence of SOGIECE exposure of 7–18% among sexual minority (i.e., non-heterosexual) people [4, 5] and 14% among trans, non-binary, and other gender minority (i.e., non-cisgender) people [6]. Approximately half of SGM people exposed to SOGIECE were subjected to these change efforts during childhood or adolescence [4, 5]. Lifetime prevalence of SOGIECE exposure is highest among those born before 2000 [2, 7]; however, at least 3–4% of SGM children and adolescents (born after 2000) are estimated to have been exposed to such practices (likely much higher, owing to the challenges in sampling and surveying youth currently/recently exposed to SOGIECE) [2, 4]. Among US sexual minority populations, up to 60% of those exposed to SOGIECE report experiencing these change efforts in religious settings, while the remainder visited counselors (many unlicensed), psychologists, and psychiatrists [3–5]. Among US gender minority populations, 35% report exposure to SOGIECE in religious settings, with the remainder of SOGIECE occurring in secular settings, including offices of medical doctors and psychologists [7]. Taken as a whole, SOGIECE are highly prevalent and continue to harm SGM worldwide; however, there is a need to more carefully compile and analyze these published estimates to understand how they vary over time, place, social characteristics of participants, and definitions of conversion therapy/SOGIECE.

### The effects of SOGIECE:

SOGIECE are ineffective, harmful, and often lead to poor psychosocial outcomes. For example, SOGIECE have been associated with poor self-esteem, internalized stigma and discrimination, self-harm, self-hatred, depression, anxiety, and adaptive substance use (i.e., as a form of coping or suppression) [2, 14]. More generally, SOGIECE can lead to isolation from both communities of origin and SGM communities, as many survivors of SOGIECE feel that they have lost years of their lives and are not able to embrace their authentic selves [12, 15]. Most alarmingly, it is estimated that over a third of those who experience SOGIECE attempt suicide [2], a statistic

---

[1]Sexual and gender minorities refers to lesbian, gay, bisexual, transgender, non-binary, queer, and Two-Spirit (LGBTQ2) people.

Kinitz *et al. Systematic Reviews*      (2021) 10:14

that does not capture those who have died of suicide. More than 40 professional regulating bodies (e.g., American Psychiatric Association, Canadian Psychological Association) and numerous regions (e.g., New York, Malta) have denounced SOGIECE due to its ineffectiveness and detrimental health and social impacts [11, 16–19]. Further, several SGM have spoken about their experiences of SOGIECE through political engagements, media, and books to share how it has impacted their lives (e.g., Muse [20]; Poisson [21]).

There is limited SOGIECE-related research—a critical knowledge gap, given ongoing public policy efforts to end SOGIECE and devise health and social support agendas for those who have experienced these practices. Over the past year, numerous national, regional, and local governments have introduced legislation to ban SOGIECE—with varying degrees of support or opposition across geographic, religious, and political lines. Rigorous research syntheses to support or refine legislative proposals related to SOGIECE are not available at this time. We therefore propose a systematic review of international data on the scope and nature of SOGIECE.

### Study aim and research question:

The aim of this review is to synthesize quantitative and qualitative literature that addresses the scope and nature of SOGIECE among SGM worldwide. To fulfil this aim, we propose the following research questions:

(1) What is the scope of SOGIECE globally? In response to this question, we will estimate how many SGM have been exposed, which sub-groups of SGM experience higher rates of SOGIECE, and how estimates of SOGIECE vary over time and place.
(2) What is the nature of SOGIECE globally? In response to this question, we will describe when, where, how, and under what circumstances SGM are exposed to SOGIECE.

### Definitions:

As there are varying definitions associated with this topic, it is necessary to define how particular terms are being taken up, see Table 1.

## Methods

### Protocol and study team

This systematic review protocol follows the PRISMA-P guideline for systematic review protocols and checklist (see Additional file 1 for PRISMA-P checklist) [24]. The systematic review team includes expertise in research methods (DG, TS, OF, AA, HK), substantive areas, including SOGIECE and SGM health (TS, OF, HK, FA, DJK, AA, ED, TG), and biomedical library sciences (DG). The research team will meet regularly throughout the review to identify and resolve challenges, validate and reconcile inclusion/exclusion decisions, and ensure quality and rigour of the review processes. The systematic review protocol has been registered on PROSPERO under the number: CRD42020196393.

### Eligibility criteria

The following criteria will be implemented for screening and selection of studies:

a. Language

Language restrictions will be in place for both screening and final inclusion of studies. Literature in French, Spanish, and English will be included due to feasibility and French, Spanish, and English being the languages spoken by members of the research team.

b. Participants

Studies involving SGM, according to definitions provided above, of all ages will be included. SOGIECE practices have been documented across a wide range of ages, countries of origin, genders, gender identities, and sexual

---

**Table 1** Definitions

| | |
|---|---|
| Sexual orientation | "a person's capacity for profound emotional, affectional, and sexual attraction to, and intimate and sexual relations with, individuals of the same gender, of a different gender, or of more than one gender" [11] |
| Gender identity | "a person's deeply felt internal and individual experience of gender including the personal sense of the body. Gender identity may be completely male or female or may lie outside the male/female binary" [11] |
| Gender expression | "a person's desired external appearance as it relates to social expectations and norms of femininity and masculinity" [11] |
| Conversion therapy | "any treatment, practice, or sustained effort that aims to repress, discourage, or change a person's sexual orientation, gender identity, gender modality, gender expression, or any behaviours associated with a gender other than the person's sex assigned at birth or that aims to alter an intersex trait without adequate justification" [11] |
| Sexual orientation and gender identity change efforts | SOGIECE are related to conversion therapy in that both sets of practices aim to repress, discourage, or change one's gender identity, gender expression, and/or sexual orientation; however, SOGIECE additionally include less well defined and advertised practices, which in some cases may not be sustained (e.g., single sessions/conversations) [2, 22, 23] |

orientations. Therefore, no other restrictions will be used with regard to participant populations.

### c. Time, geography, and setting

SOGIECE have likely been practiced for decades, if not centuries; as noted above, SOGIECE are practiced across multiple countries and settings. We anticipate that literature on this topic will be sparse; therefore, we will not restrict studies by date, geography, or setting.

### d. Study designs

Quantitative, qualitative, or mixed-methods studies will be included in the search, including case studies, case series, surveys, cohorts, interviews, and secondary analyses of existing data. We will screen the citations lists of systematic reviews, commentaries, and letters retrieved from literature searches. We anticipate that quantitative studies will be most relevant to research question 1, regarding the scope of SOGIECE, and qualitative studies will be most relevant to research question 2, regarding the nature of SOGIECE, although these methodological distinctions are not exact. Due to the inclusion of multiple study designs, we will not exclude studies based on sample size or related characteristics. Rather, the limitations of studies will be considered and discussed within the review.

### e. Content

All studies that include content related to scope (i.e., prevalence) and/or nature (i.e., descriptions of circumstances, timing, and setting) of SOGIECE will be included.

### f. Specific exclusion criteria

Given the inclusion criteria above, studies will be excluded based on the following criteria:

1. Studies about SGM that do not include any reference to SOGIECE
2. Studies that reference SOGIECE in the rationale but do not specifically address our objectives related to the scope and nature of SOGIECE
3. Theoretical or ethical essays on the origins or mutability of sexual orientation, gender identity, or gender expression
4. Ethical essays on the practice of SOGIECE
5. Psychotherapeutic guidelines for SGM-affirming care (except for consensus statements that are components of the grey literature search)

### Information sources

The following indexed medical, health science, nursing, psychology, social work, and social science databases will be searched: Medline (OVID), Embase (OVID), CINA HL, PsycInfo, Social Work Abstracts via EBSCO, Web of Science Core Collection, LGBTQ+ Source, Dissertations & Theses Global (ProQuest), and the Sociology Collection on ProQuest.

In addition to searching the databases above, references of all included full-text articles will be reviewed. Articles identified in this step will also have their references reviewed for inclusion in the study. We will hand-review the reference lists of highly relevant papers (e.g., Turban et al. [7]; Ryan et al. [23]) for additional sources (peer-reviewed and grey literature). Additionally, literature databases of co-authors and affiliated networks will be reviewed and compared to a bibliography of all included articles identified in previous stages to ensure literature saturation.

There will also be a targeted grey literature search focused on the most relevant and robust reference lists of consensus statements issued by health professional organizations about the scientific validity (or lack thereof) of SOGIECE [11].

### Search strategy

Two members of the research team, TS and DG, in consultation with all co-authors, have devised a comprehensive, peer-reviewed search strategy.

Exhaustive searches will be conducted using highly-sensitive strategies given the disseminated nature of the literature. Nine (9) bibliographic databases will be searched: Medline (OVID), Embase (OVID), CINAHL, PsycInfo and Social Work Abstracts via EBSCO, LGBTQ+ Source, Web of Science Core Collection, and Proquest Dissertations & Theses Global and the Sociology Collection (ProQuest). A search will be created in Medline and translated into the requirements of the other databases. In consultation with the principal investigator, the librarian has developed an exhaustive list of concepts and controlled terms based on relevant papers and the expertise of the research team. Searches will be iteratively improved to increase sensitivity by testing optimal combinations of keywords, synonyms, and controlled terms (Table 2). In the absence of controlled terms in the databases for SOGIECE, other related headings will be incorporated. A grey literature search strategy will be created based on a combination of browsing reference harvesting and targeted searching of key websites cited by relevant papers [18, 25–34]. The search strategy will be peer-reviewed using the Peer Review of Electronic Search Strategies (PRESS) checklist (see Additional file 2) [35]. Duplication of papers will be performed in RefWorks before the dataset is loaded into Covidence for title and abstract screening.

Kinitz *et al. Systematic Reviews*        (2021) 10:14

Page 5 of 8

**Table 2** Keywords and controlled terms used in search strategy for a systematic review of sexual orientation and gender identity and expression change efforts

| SOGIECE-related concept | SOGIECE keyword search terms (combined using OR Boolean)* | SGM keyword search terms (combined using OR Boolean)* | SGM indexed search terms |
|---|---|---|---|
| Set A: concept of "conversion" | "conversion therap*" "conversion effort*" "conversion practice*" | Bisexual* homosexual* "men who have sex with men" sexual orient* | exp *bisexuality/ exp *homosexuality/ exp *"Sexual and Gender Minorities"/ |
| Set B: concept of "repair" | "reparative therap*" "reparative effort *" "reparative practice *" | "women who have sex with women" sexual minorit* (gay* or lesbian*) | exp *"Transgender Persons"/ |
| Set C: concept of "reorientation" | "reorientation therap*" "sexual reorientation" "gender reorientation" "gender identity reorientation" | (GLB* or LGB*) queer* two spirit (nonheterosexual* or non-heterosexual*) | |
| Set D: concept of "change efforts" | "sexual orientation change" "gender identity change" "gender expression change" "psychological attempts to change a person's gender identity from transgender to cisgender" PACGI | transgender* "gender divers*" "gender creative" (non-binary AND gender) genderqueer genderfluid | |
| Set E: others | "ex-gay" "gender acceptance therap*" "reintegrative therap*" "gay cure therap*" "sexual attraction fluidity exploration" | "trans wom*" "trans m*" transwom* transm* "gender affirmation" (mtf or ftm) (transfeminine or transmasculine) "sex* reassignment" (gender identity disorder or GID) transsex* transex* gender dysphori* | |

*Note: SOGIECE sexual orientation and gender identity and expression change efforts, SGM sexual and gender minorities*
*Two sets to be combined using AND Boolean, to improve specificity

### Study records: data management, selection process, abstraction, items, and bias

To support collaboration and organization among the systematic review team, search results will be uploaded and stored in Covidence—a systematic review software manager. The senior authors will provide training to junior team members regarding the systematic review software and techniques. TS and ED will independently screen titles and abstracts, using Covidence, guided by the above inclusion and exclusion criteria. Disagreements will be resolved by consensus, and when in doubt, articles will be carried forward to full-text review. All titles and abstracts that meet inclusion criteria will then have full texts pulled for review. Full texts will be independently screened by TS and ED, using Covidence. In the event that TS and ED cannot achieve consensus, there will be full discussion, and a third co-author, DJK, will be consulted.

Data collection will utilize a standardized process. A data abstraction tool will be used and include titles, authors, year of publication, and findings relevant to the objectives: nature and scope (Additional file 3). TS and ED will independently abstract data. Calibration activities will be conducted among TS and ED to ensure uniformity in their process. Upon completing data

abstraction for 20% of articles, abstractors will meet to discuss and reconcile differences in abstracted information and adjust abstracting procedures going forward, for a list of data items and definitions, see Additional file 3.

We will use an adaptation of the Hoy et al. (2012) risk of bias tool for population-based prevalence studies to evaluate the risk of bias in quantitative studies that are included (see Additional file 4) [36]. This tool has been adapted by a subset of authors (TS, DJK, ED) for applicability to SGM samples. Qualitative articles will be assessed using the CERQual approach that assists in assessing confidence in qualitative findings [37].

### Outcomes and prioritization

The primary outcome of interest is the number of SGM who have *exposure* to SOGIECE, based on the definitions provided above. There is a need to understand the magnitude of SOGIECE worldwide and synthesize prevalence rates to illustrate that this phenomenon requires global attention.

Secondary outcomes include the following:

1. Where—i.e., the setting where SOGIECE occurred. This is relevant to identify levels and forms of

Kinitz *et al.* Systematic Reviews        (2021) 10:14

policy and legislation that can have bearing on SOGIECE prevention or enforcement of bans.

2. When—i.e., the age and calendar year when SGM are exposed to SOGIECE. This is relevant to inform policy regarding minor and adult protections. Age will be considered based on numerical presentation or categorically using such terms as "minor," "youth," and "adult."

3. Under what circumstances—i.e., reasons and motivations for attending SOGIECE, whether forced or compelled to attend or attending voluntarily.

4. How—i.e., the types of activities constituting SOGIECE.

These primary and secondary outcomes will be presented in summary results tables and narrative form, as appropriate.

### Synthesis of results

Results of the systematic review will be presented in a final report that will be structured according the specific objectives identified above, corresponding to the scope and nature of SOGIECE, and the type of data charted.

Quantitative data will be synthesized to the extent possible given the likely heterogeneity of studies selected. A meta-analysis is likely not possible due to the variability of populations (e.g., differing age groups, gender identities, gender modalities) and definitions of SOGIECE used [2, 7, 23]. Results will therefore be presented using a narrative synthesis with tables [38]. Specifically, tables will be used to display prevalence rates among different subpopulations of SGM, along with other characteristics such as geographic area, population demographics (e.g., age, religious background), and year of study/article production. Analysis of social location and equity factors, such as socioeconomic status, race/ethnicity, gender, and sexual orientation, will be conducted to better understand the nuances of SOGIECE and its impacts across and within various SGM subpopulations. The identification of potential disparities within this area will help to inform equity-oriented and population-tailored responses to SOGIECE, including supports for those who have experienced SOGIECE. Qualitative data will be appraised and combined in the narrative presentation as these data relate to the relevant section—scope and nature. In addition, results will be highlighted and discussed narratively per their relevance and potential to inform policy.

In the final section of the synthesis, we will discuss the limitations of the current literature as per the findings of the review as well as the limitations of the current study. Given the dearth of literature discussing SOGIECE, it is likely that there will be several challenges in clearly identifying robust reports that can independently answer our research questions. Reports are likely to omit various populations and demographics impacted by SOGIECE and to inadequately present information related to the outcomes under study.

### Discussion

This proposed systematic review of the prevalence and scope of SOGIECE will be the first of its kind conducted to date. Two prior systematic reviews have been published on the topic of conversion therapy, to the knowledge of our co-author team [39, 40]. One of these reviews was focused solely on gender minorities and used a relatively limited set of search terms [39, 41]. The other review was solely focused on sexual minorities and did not examine estimates of prevalence [40]. We believe that it is beneficial to simultaneously review literature on SOGIECE targeting sexual orientation, gender identity, and gender expression, given overlap between SGM populations (i.e., some sexual minorities are trans; some gender minorities are queer, bisexual, lesbian, gay), the unspecific nature of some SOGIECE (i.e., some practitioners conflate sexual orientation and gender identity, or primarily target non-conforming gender expressions), and the potential to attend SOGIECE with a practitioner who targets more than one of: sexual orientation, gender identity, and gender expression.

Results from this review will provide the prevalence of SOGIECE across international jurisdictions and summarize associations between social characteristics (gender, gender identity, sexual orientation, age, race, disability, socioeconomic position, religiosity) and SOGIECE exposure. Ecologic factors, such as time, place, and study methods, are expected to modify estimates of SOGIECE prevalence. Particularly useful to inform preventative strategies to stop the harm associated with SOGIECE, this study aims to identify the ages at which SGM are first exposed to these practices, in what settings they take place, and the precipitants of an individual experiencing SOGIECE.

### Dissemination

The impetus for this systematic review is the need for policy makers and legislators to have readily available, scientifically robust, and synthesized evidence to inform policy changes involving SOGIECE. Findings from the proposed systematic review will be beneficial to legislators in Canada and other countries and jurisdictions considering SOGIECE bans, such as Australia and Ireland [42–44]. Furthermore, identifying the scope and nature of SOGIECE will assist health care providers, SGM community leaders and advocates, and SGM people themselves when determining supports needed for those who have experienced these practices. This

Kinitz *et al. Systematic Reviews*      (2021) 10:14

Page 7 of 8

systematic review will be published in an open-access, international journal that will provide evidence for countries considering or implementing federal, provincial, or municipal bans on SOGIECE. In addition, our findings will be shared with Canadian policy leaders and inform a community-based strategic planning meeting involving survivors, researchers, service providers, and politicians. Lastly, findings will be presented at relevant national and international conferences.

## Supplementary Information

The online version contains supplementary material available at https://doi.org/10.1186/s13643-020-01563-8.

---

**Additional file 1.** PRISMA-P Checklist

**Additional file 2.** Medline search strategy was peer-reviewed using the Peer Review of Electronic Search Strategies (PRESS) checklist

**Additional file 3.** Sample Medline search strategy – PRESS validated.

**Additional file 4.** Risk of bias tool

---

### Acknowledgements
Thank you to Dr. Margaret Sampson at the Children's Hospital of Eastern Ontario for your time in reviewing this protocol and search strategy and to Jonathan Beaumier for your support in an early discussion of the protocol and insight when adapting the risk of bias assessment.

### Amendments
Any amendments made to this protocol will be recorded in PROSPERO.

### Authors' contributions
TS conceived and designed the study. TS and DJK contributed equally to this work. DJK, ED, OF, FA, TG, and TS co-developed the rationale and contributed to the first draft of search terms. DG and TS developed and refined the search strategy. DJK, TS, and ED adapted the risk of bias assessment and contributed to the first draft of the protocol. TS, OF, HK, FA, and AA contributed to the dissemination plan for the review. All authors contributed to the refining of the research question and to the critical revision of this manuscript. The guarantor of the review is Travis Salway, PhD, who leads a program of research with a substantive focus on SOGIECE at Simon Fraser University. All authors read and approved the final manuscript.

### Funding
Canadian Institutes of Health Research (PCS – 168193)

### Availability of data and materials
All data and materials included in the study are available from the cited primary data sources.

### Ethics approval and consent to participate
Ethics approval is not required for a systematic review of publicly available literature.

### Consent for publication
This study uses secondary (published) data; as such, consent will not be required.

### Competing interests
The authors declare that they have no competing interests

### Author details
[1]Division of Social and Behavioural Health Sciences, Dalla Lana School of Public Health, University of Toronto, Toronto, Canada. [2]Faculty of Health Sciences, Simon Fraser University, Blusson Hall 10506; 8888 University Dr., Burnaby, B.C. V5A 1S6, Canada. [3]British Columbia Centre for Disease Control, Vancouver, Canada. [4]Centre for Gender and Sexual Health Equity, Vancouver, Canada. [5]Université de Montréal, Montréal, Canada. [6]Centre de recherche en
santé publique, Montreal, Canada. [7]University of British Columbia Biomedical Branch Library, Vancouver, Canada. [8]University of Toronto Faculty of Law, Toronto, Canada. [9]School of Nursing, University of British Columbia, Vancouver, Canada. [10]School of Social Work, The University of British Columbia, Vancouver, Canada. [11]Institute for Mental Health Policy Research, Centre for Addiction and Mental Health, Toronto, Canada.

Received: 9 July 2020 Accepted: 17 December 2020
Published online: 08 January 2021

### References
1. Conversion Therapy and SOGIECE. 2020; Available at: https://www.cbrc.net/conversion_therapy_sogiece. Accessed 23 May 2020.
2. Salway T, Ferlatte O, Gesink D, Lachowsky NJ. Prevalence of exposure to sexual orientation change efforts and associated sociodemographic characteristics and psychosocial health outcomes among Canadian sexual minority men. Can J Psychiatry. 2020. https://doi.org/10.1177/0706743720902629.
3. Flentje A, Heck NC, Cochran BN. Experiences of ex-ex-gay individuals in sexual reorientation therapy: reasons for seeking treatment, perceived helpfulness and harmfulness of treatment, and post-treatment identification. J Homosex. 2014;61(9):1242–68.
4. Mallory C, Brown TN, Conron KJ. Conversion therapy and LGBT youth. Los Angeles: Williams Institute, UCLA School of Law; 2018.
5. Meanley SP, Stall RD, Dakwar O, Egan JE, Friedman MR, Haberlen SA, et al. Characterizing experiences of conversion therapy among middle-aged and older men who have sex with men from the Multicenter AIDS Cohort Study (MACS). Sex Res Soc Policy. 2019;17:1–9.
6. Turban JL, Beckwith N, Reisner SL, Keuroghlian AS. Association between recalled exposure to gender identity conversion efforts and psychological distress and suicide attempts among transgender adults. JAMA Psychiatry. 2019;77(1):68–76.
7. Turban JL, King D, Reisner SL, Keuroghlian AS. Psychological attempts to change a person's gender identity from transgender to cisgender: estimated prevalence across US States, 2015. Am J Public Health. 2019; 109(10):1452–4.
8. Wylie K, Knudson G, Khan SI, Bonierbale M, Watanyusakul S, Baral S. Serving transgender people: clinical care considerations and service delivery models in transgender health. Lancet. 2016;388(10042):401–11.
9. Lam JSH, Abramovich A. Transgender-inclusive care. CMAJ. 2019;191(3):E79.
10. Scheim AI, Zong X, Giblon R, Bauer GR. Disparities in access to family physicians among transgender people in Ontario, Canada. Int J Transgenderism. 2017;18(3):343–52.
11. Ashley F. Model law–prohibiting reparative practices. Available at SSRN 3398402 2019.
12. Venn-Brown A. Sexual orientation change efforts within religious contexts: a personal account of the battle to heal homosexuals. Sensoria A Journal of Mind Brain and Culture. 2015;11(1). https://doi.org/10.7790/sa.v11i1.417.
13. The Trans PULSE Canada Team. QuickStat #1 – conversion therapy. 2019; Available at: https://transpulsecanada.ca/research-type/quickstats/. Accessed 23 May 2020.
14. Pan American Health Organization, Regional Office of World Health Organization. "Cures" for an illness that does not exist: purported therapies aimed at changing sexual orientation lack medical justification and are ethically unacceptable. 2012.
15. Williams C. #DiscoSexology Part V: an interview with Zucker's patient; 2017.
16. Butterworth B. Malta just became the first country in Europe to ban 'gay cure' therapy. London: Pink News; 2016.
17. Byne W. No title. Regulations restrict practice of conversion therapy 2016.
18. Canadian Psychological Association. No title. CPA policy statement on conversion/reparative therapy for sexual orientation 2015.
19. Scasta D, Bialer P, American Psychiatric Association. Position statement on issues related to homosexuality. Arlington County: American Psychiatric Association. Available online: https://www.psychiatry.org/psychiatrists/search-directories-databases/policy-finder (Accessed 25 Oct 2016); 2013.
20. Muse E. Affirming sexual orientation and gender identity act, 2015; 2015.
21. Poisson J. "Conversion therapy" survivor shares his story. CBC Radio, Toronto, ON, Canada. 2019. https://www.cbc.ca/radio/frontburner/conversion-therapy-survivor-shares-his-story-1.5207493.

Case 3:21-cv-01297-BEN-BLM   Document 1   Filed 07/20/21   PageID.30   Page 30 of 39

Kinitz *et al. Systematic Reviews*   (2021) 10:14   Page 8 of 8

22. Salway T. Ending conversion therapy in Canada: survivors, community leaders, researchers, and allies address the current and future states of sexual orientation and gender identity and expression change efforts; 2020.

23. Ryan C, Toomey R, Diaz R, Russell S. Parent-initiated sexual orientation change efforts with LGBT adolescents: implications for young adult mental health and adjustment. J Homosex. 2020;67(2).

24. Moher D, Shamseer L, Clarke M, Ghersi D, Liberati A, Petticrew M, et al. Preferred Reporting Items for Systematic Review and Meta-Analysis Protocols (PRISMA-P) 2015 statement. Syst Rev. 2015;4(1):1.

25. Murchison G, Adkins D, Conard LA, Ehrensaft D, Elliott T, Hawkins LA. Supporting and caring for transgender children. Human Rights Campaign. 2016;11. https://www.hrc.org/resources/supporting-caring-for-transgender-children.

26. National Centre for Lesbian Rights. Conversion therapy mental health advocate letter. 2014.

27. American Medical Association. LGBTQ change efforts (so-called "conversion therapy"). Chicago: American Medical Association; 2019. p. 1–5.

28. American Psychological Association. Resolution on appropriate affirmative responses to sexual orientation distress and change efforts, vol. 29. Washington, DC: American Psychological Association. Retrieved January 2009; 2011.

29. Canadian Association for Social Work Education (CASWE-ACFTS), & Canadian Association of Social Workers (CASW). Joint statement on the affirmation of gender diverse children and youth. 2015.

30. Canadian Professional Association for Transgender Health. Submission to the Standing Committee on Justice Policy Re: Bill 77, Affirming Sexual Orientation and Gender Identity Act, 2015. 2015.

31. National Association of Social Workers National Committee on Lesbian, Gay, Bisexual, and Transgender Issues. Sexual orientation change efforts (SOCE) and conversion therapy with lesbians, gay men, bisexuals, and transgender persons. 2015.

32. Gaylesta. U.S. Joint statement on conversion therapy (draft 2.1--10/18/17). 2017; Available at: https://gaylesta.org/USJS-Draft. Accessed 23 May 2020.

33. Telfer MM, Tollit MA, Pace CC, Pang KC. Australian standards of care and treatment guidelines for transgender and gender diverse children and adolescents. Med J Aust. 2018;209(3):132–6.

34. Substance Abuse and Mental Health Services Administration. Ending conversion therapy: supporting and affirming LGBTQ youth. HHS Publication No. (SMA) 15-4928 2015.

35. McGowan J, Sampson M, Salzwedel DM, Cogo E, Foerster V, Lefebvre C. PRESS peer review of electronic search strategies: 2015 guideline statement. J Clin Epidemiol. 2016;75:40–6.

36. Hoy D, Brooks P, Woolf A, Blyth F, March L, Bain C, et al. Assessing risk of bias in prevalence studies: modification of an existing tool and evidence of interrater agreement. J Clin Epidemiol. 2012;65(9):934–9.

37. Lewin S, Glenton C, Munthe-Kaas H, Carlsen B, Colvin CJ, Gülmezoglu M, et al. Using qualitative evidence in decision making for health and social interventions: an approach to assess confidence in findings from qualitative evidence syntheses (GRADE-CERQual). PLoS Med. 2015;12(10):e1001895.

38. Aromataris E, Munn Z. Joanna Briggs Institute reviewer's manual, vol. 299. Adelaide: The Joanna Briggs Institute; 2017.

39. Wright T, Candy B, King M. Conversion therapies and access to transition-related healthcare in transgender people: a narrative systematic review. BMJ Open. 2018;8:e022425.

40. Serovich J, Craft S, Toviessi P, Gangamma R, McDowell T, Grafsky E. A systematic review of the research base on sexual reorientation therapies. J Marital Fam Ther. 2008;34(2):227–38.

41. Ashley F. Trans conversion therapy doesn't call itself conversion therapy; 2019.

42. Halpin H. A deceptive practice": Bill to ban LGBTQ conversion therapies passes second stage of Seanad. TheJournal.ie.

43. Karp P. Gay conversion therapy ban found to be LGBTIQ Australians' top priority. London: The Guardian; 2018.

44. Johnson S. Liberal justice minister 'committed' to criminalizing conversion therapy, says Edmonton MP. Toronto: Global News; 2019.

## Publisher's Note

Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

**Ready to submit your research?** Choose BMC and benefit from:

- fast, convenient online submission
- thorough peer review by experienced researchers in your field
- rapid publication on acceptance
- support for research data, including large and complex data types
- gold Open Access which fosters wider collaboration and increased citations
- maximum visibility for your research: over 100M website views per year

**At BMC, research is always in progress.**

**Learn more** biomedcentral.com/submissions



## Appendix A. PRISMA-P Checklist

This checklist has been adapted for use with systematic review protocol submissions to BioMed Central journals from Table 3 in Moher D et al: Preferred reporting items for systematic review and meta-analysis protocols (PRISMA-P) 2015 statement. *Systematic Reviews* 2015 4:1

An Editorial from the Editors-in-Chief of *Systematic Reviews* details why this checklist was adapted - Moher D, Stewart L & Shekelle P: Implementing PRISMA-P: recommendations for prospective authors. *Systematic Reviews* 2016 5:15

| Section/topic | # | Checklist item | Information reported Yes | Information reported No | Line number(s) |
|---|---|---|:---:|:---:|---|
| **ADMINISTRATIVE INFORMATION** | | | | | |
| **Title** | | | | | |
| Identification | 1a | Identify the report as a protocol of a systematic review | ☒ | ☐ | 4 |
| Update | 1b | If the protocol is for an update of a previous systematic review, identify as such | ☐ | ☒ | N/A |
| **Registration** | 2 | If registered, provide the name of the registry (e.g., PROSPERO) and registration number in the Abstract | ☒ | ☐ | 5-6 & 81-82 |
| **Authors** | | | | | |
| Contact | 3a | Provide name, institutional affiliation, and e-mail address of all protocol authors; provide physical mailing address of corresponding author | ☒ | ☐ | 7-28 |
| Contributions | 3b | Describe contributions of protocol authors and identify the guarantor of the review | ☐ | ☐ | 30-36 |
| **Amendments** | 4 | If the protocol represents an amendment of a previously completed or published protocol, identify as such and list changes; otherwise, state plan for documenting important protocol amendments | ☒ | ☐ | 38 |
| **Support** | | | | | |
| Sources | 5a | Indicate sources of financial or other support for the review | ☒ | ☐ | 40 |
| Sponsor | 5b | Provide name for the review funder and/or sponsor | ☐ | ☒ | N/A |
| Role of sponsor/funder | 5c | Describe roles of funder(s), sponsor(s), and/or institution(s), if any, in developing the protocol | ☐ | ☒ | N/A |
| **INTRODUCTION** | | | | | |
| **Rationale** | 6 | Describe the rationale for the review in the context of what is already known | ☒ | ☐ | 154-160 |
| **Objectives** | 7 | Provide an explicit statement of the question(s) the review will address with reference to | ☒ | ☐ | 162-171 |

| Section/topic | # | Checklist item | Information reported | | Line number(s) |
|---|---|---|---|---|---|
| | | | Yes | No | |
| | | participants, interventions, comparators, and outcomes (PICO) | | | |
| **METHODS** | | | | | |
| **Eligibility criteria** | 8 | Specify the study characteristics (e.g., PICO, study design, setting, time frame) and report characteristics (e.g., years considered, language, publication status) to be used as criteria for eligibility for the review | ☒ | ☐ | 191-230 |
| **Information sources** | 9 | Describe all intended information sources (e.g., electronic databases, contact with study authors, trial registers, or other grey literature sources) with planned dates of coverage | ☒ | ☐ | 232-248 |
| **Search strategy** | 10 | Present draft of search strategy to be used for at least one electronic database, including planned limits, such that it could be repeated | ☒ | ☐ | 419-483 |
| *STUDY RECORDS* | | | | | |
| Data management | 11a | Describe the mechanism(s) that will be used to manage records and data throughout the review | ☒ | ☐ | 276-279 |
| Selection process | 11b | State the process that will be used for selecting studies (e.g., two independent reviewers) through each phase of the review (i.e., screening, eligibility, and inclusion in meta-analysis) | ☒ | ☐ | 279-284 |
| Data collection process | 11c | Describe planned method of extracting data from reports (e.g., piloting forms, done independently, in duplicate), any processes for obtaining and confirming data from investigators | ☒ | ☐ | 286-292 |
| **Data items** | 12 | List and define all variables for which data will be sought (e.g., PICO items, funding sources), any pre-planned data assumptions and simplifications | ☒ | ☐ | 286-288 & 487-495 |
| **Outcomes and prioritization** | 13 | List and define all outcomes for which data will be sought, including prioritization of main and additional outcomes, with rationale | ☒ | ☐ | 300-315 |
| **Risk of bias in individual studies** | 14 | Describe anticipated methods for assessing risk of bias of individual studies, including whether this will be done at the outcome or study level, or both; state how this information will be used in data synthesis | ☒ | ☐ | 294-297 |
| *DATA* | | | | | |
| **Synthesis** | 15a | Describe criteria under which study data will be quantitatively synthesized | ☒ | ☐ | 328-347 |
| | 15b | If data are appropriate for quantitative synthesis, describe planned summary measures, methods of handling data, and methods of combining data | ☒ | ☐ | 328-347 |

2

| Section/topic | # | Checklist item | Information reported | | Line number(s) |
|---|---|---|---|---|---|
| | | | Yes | No | |
| | | from studies, including any planned exploration of consistency (e.g., $I^2$, Kendall's tau) | | | |
| | 15c | Describe any proposed additional analyses (e.g., sensitivity or subgroup analyses, meta-regression) | ☒ | ☐ | 328-347 |
| | 15d | If quantitative synthesis is not appropriate, describe the type of summary planned | ☒ | ☐ | 328-347 |
| **Meta-bias(es)** | 16 | Specify any planned assessment of meta-bias(es) (e.g., publication bias across studies, selective reporting within studies) | ☐ | ☒ | N/A |
| **Confidence in cumulative evidence** | 17 | Describe how the strength of the body of evidence will be assessed (e.g., GRADE) | ☐ | ☒ | N/A |

3

**Appendix B. Medline search strategy was peer-reviewed using the Peer Review of Electronic Search Strategies (PRESS) checklist**

Database: Ovid MEDLINE(R) <1946 to May 29, 2020> Search Strategy:
--------------------------------------------------------------------------------
1    "conversion therap*".mp.
2    "conversion effort*".mp.
3    "conversion practice*".mp.
4    or/1-3
5    ""reparative therap*".mp.
6    ""reparative effort*".mp.
7    ""reparative practice*".mp.
8    or/5-7
9    "reorientation therap*".mp.
10    "sexual reorientation".mp.
11    "gender reorientation".mp.
12    "gender identity reorientation".mp.
13    or/9-12
14    "sexual orientation change*".mp.
15    "gender identity change*".mp.
16    "gender expression change*".mp.
17    or/14-16
18    "ex-gay".mp.
19    "gender acceptance therap*".mp.
20    "reintegrative therap*".mp.
21    "gay cure therap*".mp.
22    "sexual identity fluidity exploration".mp.
23    "psychological attempts to change a person's gender identity from transgender to cisgender".mp.
24    PACGI.mp.
25    or/18-24
26    4 or 8 or 13 or 17 or 25
27    Bisexuality/
28    exp homosexuality/
29    exp "Sexual and Gender Minorities"/
30    bisexual*.mp.
31    homosexual*.mp.
32    "men who have sex with men".mp.
33    sexual orient*.mp.
34    "women who have sex with women".mp.
35    "sexual minorit*".mp.
36    (gay* or lesbian*).mp.
37    (GLB* or LGB*).mp.

1

38    (queer* or two spirit*).mp.
39    (nonheterosexual* or non-heterosexual*).mp.
40    Transgender Persons/
41    transgender*.mp.
42    "gender divers*".mp.
43    "gender creativ*".mp.
44    (non-binary and gender).mp.
45    genderqueer*.mp.
46    genderfluid.mp.
47    "trans wom*".mp.
48    "trans m*".mp.
49    "transwom*".mp.
50    "gender affirm*".mp.
51    (mtf or ftm).mp.
52    (transfeminine or transmasculine).mp.
53    "sex* reassignment"".mp.
54    ("gender identity disorder*" or GID).mp.
55    (transex* or transsex* or trans sex*).mp.
56    Transsexualism/
57    "gender dysphori*".mp.
58    or/27-57
59    26 and 58

2

**Appendix C. Data abstraction form**

Abstractor:
Author:
Journal:
Date of Publication:
Date of Extraction:

| Data element | Options | Explanatory notes |
|---|---|---|
| Study design | Qualitative<br>Quant: cross-sectional<br>Quant: longitudinal<br>Case report<br>Case series<br>Secondary data (qual)<br>Secondary data (quant)<br>Other | We anticipate quantitative studies to be most relevant to RQ1 (regarding scope/prevalence of SOGIECE). Qual, quant, and case reports/series will be relevant to RQ2 ("nature" of SOGIECE: when/where/why). |
| Study setting | Clinic; description:<br>School; description:<br>Church or religious setting; description:<br>SGM community sample; description:<br>Other community sample; description: | Study setting will have a bearing on the kinds of SOGIECE (including SOGIECE settings) that are described. |
| Country, region | Open text | Will categorize post-hoc, depending on number of studies per country/region. |
| Description of sample | Open text | E.g., "trans youth", "people living with HIV", "patients of a psychiatric clinic" |
| Sample size (N) | Numeric | |
| Socio-demographic details (%s or means/medians, range/IQR) | Gender identities<br>Gender modalities (trans, cis)<br>Race/ethnicity<br>Age<br>Religion<br>Geographies of residence<br>Markers of socioeconomic status (income, education, occupation)<br>Other | Related to RQ1, specifically to identify social correlates of SOGIECE exposure. |
| Prevalence of SOGIECE exposure | Numeric | Numerator, denominator, proportion, and measures of |

| | | variance (standard error, confidence interval) |
|---|---|---|
| Prevalence of SOGIECE exposure by subgroups | Numeric, by following, as available:<br>Gender identity<br>Gender modality<br>Age groups<br>Race/ethnicity sub-groups | Numerator, denominator, proportion, and measures of variance (standard error, confidence interval) |
| Other Notes | | |

**Appendix D. Risk of bias tool**

Adapted from Hoy D, Brooks P, Woolf A, Blyth F, March L, Bain C, et al. Assessing risk of bias in prevalence studies: modification of an existing tool and evidence of interrater agreement. Journal of Clinical Epidemiology. 2012;65(9):934-9.

| Item* | Criteria | Notes (from Hoy) |
|---|---|---|
| 1. Was the study's target population a close representation of the national population in relation to relevant variables, e.g. age, sex, occupation? | Yes (LOW RISK): The study's target population was a close representation of the national population.<br><br>No (HIGH RISK): The study's target population was clearly NOT representative of the national population. | The target population refers to the group of people or entities to which the results of the study will be generalised. Examples: The study was a national health survey of people 15 years and over and the sample was drawn from a list that included all individuals in the population aged 15 years and over. The answer is: Yes (LOW RISK).<br>The study was conducted in one province only, and it is not clear if this was representative of the national population. The answer is: No (HIGH RISK).<br>The study was undertaken in one village only and it is clear this was not representative of the national population. The answer is: No (HIGH RISK). |
| 4. Was the likelihood of non-response bias minimal? | Yes (LOW RISK): The response rate for the study was >/=75%, OR, an analysis was performed that showed no significant difference in relevant demographic characteristics between responders and nonresponders<br><br>No (HIGH RISK): The response rate was <75%, and if any analysis comparing responders and non-responders was done, it showed a significant difference in relevant demographic characteristics between responders and non-responders. | Examples:<br>The response rate was 68%; however, the researchers did an analysis and found no significant difference between responders and non-responders in terms of age, sex, occupation and socioeconomic status. The answer is: Yes (LOW RISK).<br>The response rate was 65% and the researchers did NOT carry out an analysis to compare relevant demographic characteristics between responders and non-responders. The answer is: No (HIGH RISK).<br>The response rate was 69% and the researchers did an analysis and found a significant difference in age, sex and socio-economic status between responders and non-responders. The answer is: No (HIGH RISK). |
| 5. Were data collected directly from the subjects (as opposed to a proxy)? | Yes (LOW RISK): All data were collected directly from the subjects.<br><br>No (HIGH RISK): In some instances, data were collected from a proxy. | A proxy is a representative of the subject. Examples:<br>All eligible subjects in the household were interviewed separately. The answer is: Yes (LOW RISK).<br>A representative of the household was interviewed and questioned about the presence of low back pain in each household member. The answer is: No (HIGH RISK). |
| 6. Was an acceptable case definition used in the study? | Yes (LOW RISK): An acceptable case definition was used.<br><br>No (HIGH RISK): An acceptable case definition was NOT used. | For a study on low back pain, the following case definition was used: "Low back pain is defined as activity-limiting pain lasting more than one day in the area on the posterior aspect of the body from the bottom of the 12th rib to the lower gluteal folds." The answer is: Yes (LOW RISK).<br>For a study on back pain, there was no description of the specific anatomical location "back" referred to. The answer is: No (HIGH RISK).<br>For a study on osteoarthritis, the following case definition was used: "Symptomatic osteoarthritis of the hip or knee, |

| | | radiologically confirmed as Kellgren-Lawrence grade 2-4". The answer is: LOW RISK. |
|---|---|---|
| 8. Was the same mode of data collection used for all subjects? | Yes (LOW RISK): The same mode of data collection was used for all subjects.<br><br>No (HIGH RISK): The same mode of data collection was NOT used for all subjects. | The mode of data collection is the method used for collecting information from the subjects. The most common modes are face-to-face interviews, telephone interviews and self-administered questionnaires. Examples:<br>All eligible subjects had a face-to-face interview. The answer is: Yes (LOW RISK).<br>Some subjects were interviewed over the telephone and some filled in postal questionnaires. The answer is: No (HIGH RISK). |
| 9. Was the length of the shortest prevalence period for the parameter of interest appropriate? | Yes (LOW RISK): The shortest prevalence period for the parameter of interest was appropriate (e.g. point prevalence, one-week prevalence, one-year prevalence).<br><br>No (HIGH RISK): The shortest prevalence period for the parameter of interest was not appropriate (e.g. lifetime prevalence) | The prevalence period is the period that the subject is asked about e.g. "Have you experienced low back pain over the previous year?" In this example, the prevalence period is one year. The longer the prevalence period, the greater the likelihood of the subject forgetting if they experienced the symptom of interest (e.g. low back pain). Examples:<br>Subjects were asked about pain over the past week. The answer is: Yes (LOW RISK).<br>Subjects were only asked about pain over the past three years. The answer is: No (HIGH RISK). |
| 10. Were the numerator(s) and denominator(s) for the parameter of interest appropriate? | Yes (LOW RISK): The paper presented appropriate numerator(s) AND denominator(s) for the parameter of interest (e.g. the prevalence of low back pain).<br><br>No (HIGH RISK): The paper did present numerator(s) AND denominator(s) for the parameter of interest but one or more of these were inappropriate. | There may be errors in the calculation and/or reporting of the numerator and/or denominator. Examples:<br>There were no errors in the reporting of the numerator(s) AND denominator(s) for the prevalence of low back pain. The answer is: Yes (LOW RISK).<br>In reporting the overall prevalence of low back pain (in both men and women), the authors accidentally used the population of women as the denominator rather than the combined population. The answer is: No (HIGH RISK). |

**\* Items in original Hoy tool that are excluded:**
items 2-3: there is no known sampling frame for sexual or gender minorities; therefore, assessing this is not possible; nor is random selection possible
item 7: there are no measures of SOGIECE or CT that have been tested for psychometric properties

2