**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| REINTEGRATIVE THERAPY ASSOCIATION, INC., a California corporation; and DR. JOSEPH NICOLOSI JR., an individual,<br>Plaintiffs,<br>v.<br>DAVID J. KINITZ, an individual; and TRAVIS SALWAY, an individual,<br>Defendants. | Case No.: 3:21-cv-1297-BEN-BLM<br><br>**ORDER:**<br>**(1) GRANTING DEFENDANT TRAVIS SALWAY'S MOTION TO DISMISS;**<br><br>**(2) GRANTING DEFENDANT DAVID J. KINITZ'S MOTION TO DISMISS; AND**<br><br>**(3) DENYING AS MOOT PLAINTIFFS' EX PARTE APPLICATION TO BIFURCATE DEFENDANT SALWAY'S ANTI-SLAPP MOTION**<br><br>**[ECF Nos. 9, 10, and 30]** |

## I. INTRODUCTION

Plaintiffs Reintegrative Therapy Association, Inc. ("RTA") and Dr. Joseph Nicolosi Jr. ("Dr. Nicolosi") (collectively, "Plaintiffs") bring this action for defamation and injunctive relief against Defendants David J. Kinitz ("Kinitz") and Dr. Travis Salway ("Dr. Salway") (collectively, "Defendants"). ECF No. 1. Before the Court is: (1) Dr. Salway's

Motion to Dismiss; (2) Kinitz's Motion to Dismiss; (3) Dr. Salway's Anti-SLAPP Motion; (4) Kintiz's Anti-SLAPP Motion; and (5) Plaintiffs' *Ex Parte* Application to Bifurcate the Anti-SLAPP Motion. ECF Nos. 9, 10, 30. The Motions were submitted on the papers without oral argument pursuant to Civil Local Rule 7.1(d)(1) and Rule 78(b) of the Federal Rules of Civil Procedure. *See* ECF Nos. 25, 33. After considering the papers submitted, supporting documentation, and applicable law, the Court **GRANTS** both Motions to Dismiss for lack of personal jurisdiction and **DENIES** as moot Defendants' Anti-SLAPP Motions and Plaintiffs' *Ex Parte* Application to Bifurcate.

## II.  BACKGROUND

Plaintiffs bring this suit alleging defamation based on statements made in a scholarly journal article authored by Defendants and published by a third-party non-defendant.

### A.  Statement of Facts[1]

RTA is a California 501(c)(3) non-profit corporation "that offers training in Reintegrative Therapy® psychological services to mental health professionals who treat individuals seeking healing from addiction and trauma." Compl. at 2,[2] ¶ 7. "Dr. Nicolosi is the founder and president of the board of the [RTA], and is a licensed clinical psychologist serving as the clinical advisor for the [RTA]." *Id.* at 2, ¶ 8.

Defendants co-authored an article titled *The Scope and Nature of Sexual Orientation and Gender Identity and Expression Change Efforts: A Systematic Review Protocol* (the "Article"). *Id.* at 3, ¶ 9; *see also* Ex. 1 to Compl. Plaintiffs attach the Article to their Complaint as Exhibit 1. Plaintiffs allege that "[o]n or around January 8, 2021, the Defendants caused the . . . Article to be published in the 'Systematic Reviews' journal, which is an online-only open access medical journal published by BioMed Central

---

[1]  The majority of the facts set forth are taken from the Complaint, and for purposes of ruling on the instant Motions to Dismiss, the Court assumes the truth of the allegations pled and liberally construes all allegations in favor of the non-moving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

[2]  Unless otherwise indicated, all page number references are to the ECF-generated page number contained in the header of each ECF-filed document.

("BMC")." Compl. at 10, ¶ 20. Plaintiffs allege that the Article contains the following defamatory statements:

> "What are conversion therapy and SOGIECE?[[3]]
>
> "Conversion therapy," sometimes referred to as "reparative therapy," ***"reintegrative therapy,"*** or "reorientation therapy," **refers to a set of pseudo-scientific, discredited practices that aim to deny and suppress the sexual orientations, gender identities, and/or gender expressions of sexual and gender minorities (SGM).** Conversion therapy ranges from talk-"therapies" to invasive treatments such as eclectic [sic] shock therapies [1].
>
> …
>
> SOGIECE are ineffective, harmful, and often lead to poor psychosocial outcomes. For example, SOGIECE have been associated with poor self-esteem, internalized stigma and discrimination, self-harm, self-hatred, depression, anxiety, and adaptive substance use (i.e., as a form of coping or suppression) [2, 14]. More generally, SOGIECE can lead to isolation from both communities of origin and SGM [sexual and gender minorities] communities, as many survivors of SOGIECE feel that they have lost years of their lives and are not able to embrace their authentic selves [12, 15]. Most alarmingly, it is estimated that over a third of those who experience SOGIECE attempt suicide [2], a statistic that does not capture those who have died of suicide."

*Id.* at 11, ¶ 20; *see also* Ex. 1 to Compl. at 24–25. Plaintiffs allege that the statements are false and defamatory, because "Reintegrative Therapy® does not seek to change a person's sexual orientation" and instead, "uses evidence-based interventions designed to resolve traumas and addictions." Compl. at 4, ¶ 15. Plaintiffs claim that "Reintegrative Therapy® may not accurately be characterized as a Sexual Orientation Change Effort, or as a Sexual Orientation and Gender Identity and Expression Change Effort, commonly referred to by the acronyms SOCE and SOGIECE or by the pejorative term 'conversion therapy.'" *Id.* at 4, ¶ 16. Plaintiffs allege that Reintegrative Therapy® is not a discredited pseudo-scientific

[3] The Article defines: (1) SOGIECE as sexual orientation and gender identity and expression change efforts; and (2) SGM as sexual and gender minorities. Ex. 1 to Compl. at 24.

practice, given the qualifications, training, certifications, and ethical requirements associated with becoming a Reintegrative Therapy® practitioner. *Id.* at 12, ¶ 24.

Plaintiffs further claim that the "citation supporting the alleged statement about Reintegrative Therapy® does not even mention the term 'Reintegrative Therapy®,' falsely representing the cited source and, thereby, evidencing that Defendants consciously and deliberately added the term 'Reintegrative Therapy' with the intent of harming Plaintiffs." *Id.* at 13–14, ¶ 26. Plaintiffs further allege that "Defendants are political activists, not independent researchers" and cite to: (1) a personal story by Kinitiz about how he survived conversion therapy; and (2) a bill in Canada seeking to criminalize "conversion therapy" for which Dr. Salway is an advocate. *Id.* at 14, ¶ 27.

Plaintiffs allege that "familiarity with the term Reintegrative Therapy® necessarily implies knowledge of and familiarity with Dr. Nicolosi and the [RTA]" and therefore, the statements "regarding Reintegrative Therapy® necessarily must be understood as referring to Plaintiffs by clear implication." *Id.* at 18, ¶ 40. Plaintiffs support this allegation by stating that two people read the Article and understood it as referring to Plaintiffs, including "William Stanus, a Canadian therapist with whom the Plaintiffs are familiar" and "Laura Haynes, a licensed clinical psychologist living in California." *Id.* Plaintiffs allege the Article harms their reputation and "falsely imputes on Plaintiffs' Reintegrative Therapy® trademark and mental health practice, [a] severe, negative stigma . . . ." *Id.* at 18, ¶ 41.

**B. <u>Procedural History</u>**

Plaintiffs filed a Complaint against Defendants on July 20, 2021, alleging defamation per se and seeking both money damages and injunctive relief. Compl. at 1, 21. On October 14, 2021, Dr. Salway filed a Motion to Dismiss and Anti-SLAPP Motion to Strike. ECF No. 9 ("Motion I"). On October 21, 2021, Plaintiffs filed an *Ex Parte* Application to Bifurcate the Anti-SLAPP Motion and deny it *without prejudice*. ECF No. 10. Between September 30, 2021 and May 10, 2022, Plaintiffs filed several Motions seeking to extend the deadline to serve Kinitz. On May 25, 2022, Plaintiffs served Kinitz

through his publicly listed email address.[4] ECF No. 30 at 13. On June 15, 2022, Kinitz filed a Motion to Dismiss and an Anti-SLAPP Motion to Strike. ECF No. 30 ("Motion II"). The parties properly responded to all motions now before the Court.

## III. LEGAL STANDARD

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007). Once a defendant files a motion to dismiss pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, the plaintiff bears the burden of establishing personal jurisdiction over the defendant. *Wash. Shoe Co. v. A-Z Sporting Goods, Inc.*, 704 F.3d 668, 671–72 (9th Cir. 2012); *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011). In general, a court may exercise personal jurisdiction over an out-of-state defendant consistent with both the forum state's long-arm statute and constitutional due process. *Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.*, 103 F.3d 888, 893 (9th Cir. 1996).

Where, as here, the motion is based on written materials rather than an evidentiary hearing, a plaintiff is only required to "make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1066 (9th Cir. 2014) (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004)). A "prima facie" showing means that "the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant." *Lindora, LLC v. Isagenix Int'l, LLC*, 198 F. Supp. 3d 1127, 1135 (S.D. Cal. 2016) (quoting *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir.1995)).

In determining whether a plaintiff has met his burden, "uncontroverted allegations in the complaint must be taken as true," and "[c]onflicts between parties over statements

[4] Kinitz seeks to dismiss Plaintiffs' Complaint for improper service of process, based on noncompliance with this Court's prior orders. ECF No. 30 at 17–19. Because the Court lacks personal jurisdiction over Kinitz, as set forth *infra*, the Court will not reach the issue.

contained in affidavits must be resolved in the plaintiff's favor." *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1108 (9th Cir. 2002) (citations omitted). However, "'bare bones' assertions of minimum contacts with the forum or legal conclusions unsupported by specific factual allegations will not satisfy a plaintiff's pleading burden." *Swartz v. KPMG LLP*, 476 F.3d 756, 766 (9th Cir. 2007). Further, although a complaint may plead personal jurisdiction over a defendant, to the extent the defendant moves to dismiss by filing affidavits or declarations refuting the jurisdictional allegations in a complaint, the plaintiff may not rest on those allegations and must support them with the plaintiff's own affidavits or evidence. *See, e.g.*, *Data Disc. v. Systems Tech. Association, Inc.*, 557 F.2d 1280, 1284 (9th Cir. 1977) (holding that a court "may not assume the truth of allegations in a pleading which are contradicted by affidavit").

"Where, as here, no federal statute authorizes personal jurisdiction, the district court applies the law of the state in which the court sits." *Mavrix Photo*, 647 F.3d at 1223 (internal citations omitted). California's long-arm statute permits its courts to exercise personal jurisdiction "on any basis not inconsistent with the Constitution of this state or of the United States." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (quoting CAL. CIV. PROC. CODE § 410.10). Thus, "California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution," and the Court must ensure that its assertion of personal jurisdiction over a party "comports with the limits imposed by federal due process." *Daimler*, 571 U.S. at 125 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 464 (1985)).

Personal jurisdiction can be either "general" or "specific." *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415–16 (1984). Although there are two forms of personal jurisdiction, only specific jurisdiction is at issue here. *See* Oppo. I at 16 ("Plaintiffs do not contend that general jurisdiction exists over Mr. Salway."); *see also* Oppo. II at 21–25. The three-pronged test to establish specific jurisdiction is:

(1) The non-resident defendant must purposefully direct his activities or

> consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802. The burden is on the plaintiff to establish the first two prongs—if unsuccessful, there is no personal jurisdiction. *Id.* However, "[i]f the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (citing *Burger King*, 471 U.S. at 476–78).

In tort cases, the first prong focuses on purposeful direction, which invokes the "effects" test pursuant to *Calder v. Jones*, 465 U.S. 783 (1984). Under the "effects" test, "[t]he defendant must have '(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.'" *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017) (quoting *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 673 (9th Cir. 2012)). The Supreme Court has also held that "[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). In addition, "the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State;" and the "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285 (citations omitted). The Court finds that Plaintiffs have not established specific personal jurisdiction under the first two prongs, under either the "effects" test or other Supreme Court holdings.

## IV.  DISCUSSION

Defendants argue the Complaint should be dismissed because this Court lacks personal jurisdiction over them.  Motion I at 17; Motion II at 19.  Defendants argue that Plaintiffs "cannot demonstrate sufficient contacts to support the Court's exercise of specific jurisdiction . . . ."  Motion I at 17–18; Motion II at 19–20.  Defendants assert they do "not reside, and [are] not domiciled or at home in California, or elsewhere in the United States."  Motion I at 17; Motion II at 19. (internal quotation marks and citations omitted).  Dr. Salway contends that at all relevant times, he was a resident of Canada, and "engaged in his scholarly work on the Article" while "living in Canada, not California."  Motion I at 18.  Kinitz asserts that he "lived in Canada 'at all times' mentioned in the complaint."  Motion II at 20.  Defendants also argue that instead of alleging that Defendants "expressly aimed publication of the Article at the forum state where [they] knew it would be likely to cause harm, the [C]omplaint says only that an 'online-only' medical journal published the Article."  Motion I at 18; Motion II at 20.  Defendants further argue there are no allegations that they "had any role in the Article's publication, as distinct from its authorship."  *Id.*  Defendants contend that the Article: (1) references Canada twenty times and fails to mention California even once, and (2) makes no mention of RTA or Dr. Nicolosi, making it implausible that Defendants intended or knew the Article was likely to injure either Plaintiff.  Motion I at 18–19; Motion II at 20.

Plaintiffs counter that: (1) they "are California residents who practice Reintegrative Therapy® primarily in California;" (2) that RTA "is based in California and is the exclusive licensor of Reintegrative Therapy®;" (3) and that "Dr. Nicolosi's professional practice is located in California and involves providing Reintegrative Therapy® treatment to" California patients.  ECF No. 21 ("Oppo. I") at 19; ECF No. 31 ("Oppo. II") at 24.  Plaintiffs further argue that at least two third-party individuals—one located in California and one in Canada—"read and understood the [] Article as referring to and defaming [RTA] and Dr. Nicolosi."  *Id.*  Plaintiffs therefore contend that the reputational "harm occurred in California."  *Id.*  Plaintiffs state that "a retraction request was sent to [Defendants], but

[they] did not retract the defamatory statements, further evidencing intent to cause harm to [RTA] and Dr. Nicolosi in California." Oppo. I at 20; Oppo. II at 24. Plaintiffs argue the Article refers to RTA, because Reintegrative Therapy® is the trademarked product of RTA. Oppo. I at 27; Oppo. II at 31. Plaintiffs contend the Article refers to Dr. Nicolosi, because he is integrally tied to Reintegrative Therapy® and the founder and president of RTA. *Id.* Plaintiffs also contend that at least two California residents—Dr. Haynes and Plaintiff Dr. Nicolosi—reviewed the Article. Oppo. I at 20; Oppo. II at 24. As to Dr. Salway, Plaintiffs argue that California is not a foreign forum, because Dr. Salway attended the University of California at Berkley for his undergraduate education. Oppo. I at 21.

Plaintiffs go on to argue how BMC, the publisher, is connected to California, because the webpage where the Article "is published has a California Consumer Privacy Statement indicating clear intent for the article to reach and effect the forum state in California." Oppo. I at 20; Oppo. II at 23. Plaintiffs further contend that several California Universities provide links to BMC's journals and maintain memberships with BMC. *Id.* Plaintiffs also assert that BMC "is a part of Springer Nature, which is . . . registered in California as a foreign corporation." Oppo. I at 20; Oppo. II at 23–24. Plaintiffs next argue that Defendants availed themselves to a global-reaching network, including California, by choosing to publish the Article with BMC. Oppo. I at 20–21; Oppo. II at 23–25. Plaintiffs allege that if Defendants "wanted to limit the impact of [the] [A]rticle to Canada, there are undoubtedly numerous Canadian-based journals in which [they] could have published . . . ." Oppo. I at 21; *see also* Oppo. II at 23.

**A. <u>Purposeful Direction</u>**

Although Defendants committed the intentional acts of authoring the Article and submitting it for publication, the Court cannot find that Defendants expressly aimed their activities at California sufficient to establish purposeful direction as required by the "effects" test. Several of Plaintiffs' arguments rest on allegations not included in the Complaint. However, assuming the truth of all these allegations—even those not properly pleaded—Defendants' contacts to California include: (1) Defendants' connection to

Plaintiffs, including the alleged harm that occurred in California, based on the Article's defamatory statements regarding Plaintiffs, as well as Plaintiffs' request for a retraction; (2) Defendants' citation to one California source in the Article; (3) Defendants' connection to third-party BMC, which has its own alleged connections to California; and (4) Dr. Salway's connection to the University of Berkely, where he received his undergraduate education. Dr. Salway's undergraduate education in California does not relate to the forum-related activities at issue—including the authoring and publication of the article—and therefore, will not be considered in the Court's purposeful direction analysis. *See Werner v. Dowlatsingh*, 818 F. App'x 671, 672–73 (9th Cir. 2020) ("Neither Dowlatsingh's trips to California to attend VidCon, nor his sponsorship agreement with a California watch-making company, are related to the present suit and thus do not support an exercise of specific personal jurisdiction.").

Plaintiffs cite *Calder*, *Keeton*, and *Gordy* as specific case examples to argue that this Court has specific jurisdiction over both Defendants. These cases are distinguishable from the instant case. In *Calder*, an actress sued a reporter and an editor for a defamatory article published in the National Enquirer and distributed in California. *Calder*, 465 U.S. at 784–85. Around 600,000 copies of the newspaper were circulated in California on a weekly basis. *Id.* at 785. Most of the research for the article was done in Florida, but the writer relied on phone calls made to sources in California, which included a call to the plaintiff's home to read a draft of the article to the plaintiff's husband for comment. *Id.* at 785–86. The writer was employed by the National Enquirer (*i.e.*, the publisher). *Id.* at 786. The other defendant was president and editor of the National Enquirer and oversaw "just about every function of the" newspaper. *Id.* "He reviewed and approved the initial evaluation of the subject of the article and edited it in its final form." *Id.* When a request for a retraction was sent, he declined to print one. *Id.* The *Calder* Court found personal jurisdiction over both the writer and editor. *Id.* at 791.

In *Gordy*, the Court found personal jurisdiction over a writer and a news company that published an allegedly defamatory article in New York about a plaintiff living in

California. *Gordy v. Daily News, L.P.*, 95 F.3d 829, 831 (9th Cir. 1996), *as amended* (Oct. 28, 1996). Only thirteen to eighteen copies of the article were distributed in California, but the Court found the case analogous to *Calder* and held that the writer and publisher intentionally directed the article at the plaintiff, knowing that the plaintiff lived in California. *Id.* at 833. The publisher's focus was on entertainment news, and it frequently sent reporters to gather "news from stringers, anonymous sources, and news services in California." *Id.* at 831. The publisher also served a limited number of subscribers in California. *Id.* at 836. As to the writer, he wrote newspaper columns for the publisher, and he authorized his associate to make phone calls to people in California concerning the article, including a call to the plaintiff and two other California sources. *Id.* at 831.

*Calder* and *Gordy* are distinguishable for several reasons. First, all research and writing performed by Defendants in authoring the Article at issue, was performed in Canada. The Defendants did not travel to California or phone any sources in the state. The Article relied on forty-four citations, many of which reference Canada. Ex. 1 to Compl. at 29. Although several sources mention or came from the United States, only one appears to have originated from California, specifically, from the UCLA School of Law. *See id.* The Article itself, however, makes no mention of California, and although it refers to the United States, it also refers to Canada, Australia, and Ireland. *See generally* Ex. 1 to Compl. The Article was also funded by the Canadian Institutes of Health Research, and not by any named Defendants, or even the publisher. *Id.* at 29.

The *Gordy* Court also distinguished two cases where personal jurisdiction was not found, noting there was doubt as to whether the defamation targeted California and/or the plaintiffs in those cases. *Gordy*, 95 F.3d at 833, 834. One case was *Church of Scientology of California v. Adams*, 584 F.2d 893 (9th Cir. 1978). There, the California Church of Scientology brought a libel suit against the publisher and two authors of five articles discussing Scientology. *Id.* at 895. The publisher and authors were located in Missouri and although the authors interviewed a person connected to a Scientology office in California, the authors never entered California and the article did not mention the

California Church by name. *Id.* The Ninth Circuit noted that the California Church was "included in the discussion only to the extent that one article makes reference to 'about 300 branches' of the Scientology movement in the context of discussing the St. Louis Scientology office, and to the extent that the articles concern Scientology in general." *Id.* at 899. Although the California Church's complaint alleged that the articles were referring to it, the Court held that "[t]he few copies of the articles circulated in California, when considered in relation to the diffuse, nonspecific direction of the writings as to this California plaintiff, suggest that the publisher's relationship to . . . California . . . is too attenuated to support an assertion of jurisdiction over the person." *Id.*

The Court finds the allegations at issue here less analogous to *Calder* and *Gordy*, and more akin to those of *Church of the Scientology*. In both *Calder* and *Gordy*, the articles at issue clearly focused on: (1) California residents named in the articles, and (2) those residents' activities in California. That is not the case here. First, the Article does not name or in any way reference RTA or Dr. Nicolosi, specifically. *See generally* Ex. 1 to Compl. Second, the term "reintegrative therapy" is used only once in the text of the Article and again in Table 2, where it is abbreviated as "reintegrative therap[]." *Id.* at 24, 27. Table 2 designates "reintegrative therap[]" as a keyword that was used (in combination with other keywords) to search for published articles in performing a systemic review of the literature. *Id.* at 27. Third, the focus of the Article was not on the California based activities of RTA or Dr. Nicolosi. Instead, the Article aimed "to synthesize quantitative and qualitative literature that addresses the scope and nature of SOGIECE among SGM worldwide." *Id.* at 25. As in *Church of Scientology*, the Article's limited references to "reintegrative therapy" can be described as diffuse and nonspecific with regards to RTA and Dr. Nicolosi. This is especially true, given the focus of the Article and designation of "reintegrative therap[]" as a keyword used to gather and analyze existing global literature regarding the broader subject of SOGIECE. The authors' single source connected to California in *Church of Scientology* is similar to the Defendants' sole California based citation at issue in the Article here.

In addition, even if the Article is referencing Reintegrative Therapy® or had mentioned RTA or Dr. Nicolosi by name, the Court would still find that the Article is not expressly aimed at Plaintiffs or California. *See generally id.* The Article fails to describe any of RTA's alleged practices respecting Reintegrative Therapy®—it only compares Reintegrative Therapy® to other supposed forms of gender change efforts. *See id.* at 24. In addition, the focus of the Article remains on the scope and nature of the global literature respecting SOGIECE, making no mention of California.

Although the Court must assume as true all allegations lodged in Plaintiffs' Complaint,[5] Plaintiffs rely on and attach a copy of the Article thereto. *See id.* A review of the Article reveals the limited nature of the use of "reintegrative therapy" throughout.[6] *Cf. Sprewell v. Golden State Warriors*, 266 F.3d 979, 988-89 (9th Cir.), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001) ("We have held that a plaintiff can—as Sprewell has done here—plead himself out of a claim by including unnecessary details contrary to his claims."). The Court finds it implausible to assume that a systemic review of global literature—that cites just one California based source out of forty-four total citations—focuses on or is expressly aimed at California.

Plaintiffs' reliance on *Keeton* is also misplaced. *See Keeton v. Hustler Mag., Inc.*,

---

5 Plaintiffs make arguments that Defendants failed to use the trademark associated with Reintegrative Therapy® and that this makes it more likely that Defendants targeted Plaintiffs. If anything, the Court finds the absence of the trademark symbol to mean that Defendants did not know that the term was trademarked by RTA and Dr. Nicolosi. Furthermore, the allegations that Defendants did not perform due diligence in failing to include the trademark is not in dispute in this case. Plaintiffs allege defamation per se and not trademark infringement.

6 The Court clarifies that it expresses no opinion as to the substantive issue of whether the defamatory statements here are "of and concerning" RTA and Dr. Nicolosi for purposes of Rule 12(b)(6). The Court only looks to these allegations to determine whether Defendants conduct was expressly aimed at (or targeted) California. *See Church of Scientology*, 584 F.2d at 899 (noting doubt as to the "of and concerning" element of defamation when determining whether certain published articles targeted California). Additional allegations not relevant to the jurisdictional analysis could potentially state a claim for defamation respecting the "of and concerning" element.

465 U.S. 770, 772 (1984). There, a resident of New York sued Hustler Magazine, Inc. in New Hampshire, alleging she was libeled in five different issues of the publication. *Id.* Hustler's primary contact with New Hampshire was "the sale of some 10 to 15,000 copies of Hustler magazine in that State each month." *Id.* The Court found personal jurisdiction over Hustler, relying on the distribution of the magazine in New Hampshire, and the alleged damage the magazine caused within the state. *Id.* at 776. Plaintiffs are correct that, based on *Keeton*, "[t]he tort of libel is generally held to occur wherever the offending material is circulated" and because Plaintiffs are in California and at least one third-party California reader reviewed the Article, the intentional tort occurred in the state. *Id.* at 777; *see also Walden*, 571 U.S. at 288 (stating in its analysis of *Calder* that "the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to *California*, not just to a plaintiff who lived there. That connection, combined with the various facts that gave the article a California focus, sufficed to authorize the California court's exercise of jurisdiction."). However, *Keeton* is distinguishable because there, the plaintiff sued Hustler—both the publisher and distributor of the magazine—directly. Here, BMC is not a defendant and as established previously, the named Defendants did not publish the Article or take part in its distribution in California. Furthermore, although not relied upon in the holding, in *Keeton*, there was no question or discussion as to whether the defamatory material named and/or focused on the plaintiff. *See Keeton*, 465 U.S. at 777 n.5. As noted above, the Article here did not specifically name RTA or Dr. Nicolosi, and even if its use of the term "reintegrative therapy" referred to Plaintiffs, the focus of the Article was not on Plaintiffs' California based activities.

The Court also notes that although *Keeton*, *Calder*, and *Gordy* remain good law, these cases came before the Supreme Court's holdings in *Walden*. Plaintiffs' Oppositions fail to distinguish or even cite *Walden*, despite its impact on jurisdictional analyses. There, a police officer/deputized DEA agent was sued in Nevada for allegedly tortious conduct related to an unlawful seizure of cash that occurred in Georgia. *Walden*, 571 U.S. at 279. After the tortious incident, the DEA agent helped draft a probable cause affidavit to support

seizure of the funds, knowing the affected plaintiffs lived in Nevada. *Id.* at 280–81. The Supreme Court found no specific personal jurisdiction, holding that "[r]egardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State." *Id.* at 290. The Court continued that "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* The Ninth Circuit subsequently explained how "[t]he [*Walden*] Court made clear that we must look to the defendant's 'own contacts' with the forum, not to the defendant's knowledge of a plaintiff's connections to a forum." *Axiom Foods*, 874 F.3d at 1070. The Ninth Circuit further held that "while a theory of individualized targeting may remain relevant to the minimum contacts inquiry, it will not, on its own, support the exercise of specific jurisdiction, absent compliance with what *Walden* requires." *Axiom Foods*, 874 F.3d at 1070. Both *Walden* and the Ninth Circuit extended this reasoning to a defendant's connections to third parties, in addition to the plaintiff. *See Walden*, 571 U.S. at 286 ("[A] defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."); *Axiom Foods*, 874 F.3d at 1068 (quoting *Walden*, 571 U.S. at 286).

Defendants' contacts to California, as alleged in the Complaint and Plaintiffs' Oppositions, make several references to Plaintiffs' injuries in California and BMC's contacts to California. Although the allegations show that Defendants created a contact with Plaintiffs, based on Plaintiffs' injury in the state of California, this contact did not connect Defendants to California in a meaningful way as required by *Walden*. *Cf. Werner*, 818 F. App'x at 672–73 (the plaintiff's "suit related conduct"—allegedly displaying copyright protected photos via videos uploaded to YouTube [a California company] from Toronto—did not 'create a substantial connection with [California].'"). And as previously established, even if the Article somehow referenced the California Plaintiffs, it did not focus on Plaintiffs or the forum state. The unsuccessful request for a retraction was unilateral conduct by Plaintiffs and therefore, insufficient under *Walden*. 571 U.S. at 291 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)) ("Respondents' Nevada attorney

contacted petitioner in Georgia, but that is precisely the sort of 'unilateral activity' of a third party that 'cannot satisfy the requirement of contact with the forum State.'"). The same is true respecting Defendants' connection to BMC. The Court is required to focus on Defendants' contacts with the state—not a third-party publisher.

Plaintiffs argue that under *Calder*, *Gordy*, and *Keeton*, "an author publishing a defamatory article in a publication that has a publishing presence, even a minimal presence, in the forum state, intentionally avails himself of the publisher's contacts with the forum state, establishing personal jurisdiction." Oppo. II at 23; *see also* Oppo. I at 20–21. As explained above, this broad argument directly conflicts with *Walden* and is unsupported by the holdings in *Calder*, *Gordy*, and *Keeton*. Plaintiffs are not suing BMC, and BMC did not employ Dr. Salway or Kinitz. Although Defendants are connected to BMC through the publication of the Article, Defendants themselves did not publish the Article. The allegations state that Defendants ***caused*** the article to be published in Systemic Reviews, which is an online medical journal published by BMC. Compl. at 10, ¶ 20. Plaintiffs Oppositions even concede that BMC published the article.[7] Oppo. I at 20; Oppo. II at 23. The reasonable inference from this allegation is that Defendants submitted the Article to Systemic Reviews for publication and BMC subsequently published the Systemic Reviews Article on its open-access website, which caused the Article to be distributed for review in California. Based on the allegations, Defendants are two steps removed[8] from the alleged harm to Plaintiffs in California.

Considering the principles, holdings, and distinguishing factors of the above cases, the Court cannot plausibly find sufficient contacts to support specific personal jurisdiction over Defendants in this case. Defendants did not expressly aim their Article at Plaintiffs

---

[7] Plaintiffs' Opposition to Kinitz's Motion to Dismiss states that Kinitz published the article in BMC, but then later contradict themselves, stating that BMC was the publisher. Oppo. II at 13–15, 23.

[8] Despite allegations that the Article was published in Systemic Reviews, Plaintiffs make no argument respecting any connections between Defendants and Systemic Reviews, or Systemic Reviews and California.

or California and as such, Defendants' contacts with the forum are insufficient under *Walden*. Therefore, Defendants did not purposefully direct their activities to Plaintiffs or the forum state, meaning there is no specific jurisdiction. Accordingly, the Court **GRANTS** both Motions to Dismiss for lack of personal jurisdiction. Although the Court questions how an amended complaint could cure the jurisdictional deficiencies stated herein, the Complaint has yet to be amended and courts freely grant leave for such. If Plaintiffs wish to file an amended complaint, they must do so ***within fourteen days*** of this order being electronically docketed.

**B. Reasonableness**

Even if the Court were to find that Plaintiffs satisfied the first two prongs required for specific jurisdiction,[9] the Court would likely find litigation of the matter in California to be unreasonable. Defendants argue that: (1) Canadian courts provide an alternative forum for Plaintiffs' claims; (2) California and the United States lack a significant interest in adjudicating matters addressing scholarly activities conducted solely in Canada and funded by the Canadian Institutes of Health Research; (3) the country is foreign to both Defendants and this controversy; and (4) neither Defendant directed their activities at California in the Article. Motion I at 19; Motion II at 21. Plaintiffs argue jurisdiction is reasonable because: (1) Defendants' statements were not limited to Canada; (2) the company with which they chose to publish had a global-reaching network, including circulation in California; (3) Defendants were asked to retract the statements and did not do so; (4) Dr. Salway obtained his undergraduate degree in California; and (5) California has an interest in redressing damage caused therein. Oppo. I at 20–21; Oppo. II at 25. The Court notes that both parties' arguments respecting reasonableness provide conclusory statements with little analytical support. However, Plaintiffs fail to rebut Defendants'

---

[9] The Court is not required to entertain the remaining prongs of the specific jurisdiction discussion and therefore, provides only a limited analysis. *See Axiom Foods*, 874 F.3d at 1071 n.6 ("Having decided that Appellants do not meet their burden with respect to the second prong of the purposeful direction test, we need not address the last prong.").

argument that Canada is a proper forum. *See Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1490 (9th Cir. 1993), *holding modified by Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006) ("Here, the claims against the Swedish doctors could possibly be brought in Sweden. The plaintiff bears the burden of proving the unavailability of an alternative forum."). It is also likely that Canada has an interest in adjudicating the instant dispute over an article funded by its own Canadian Institute of Health Research. *See Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cty.*, 480 U.S. 102, 115 (1987) (quoting *United States v. First National City Bank,* 379 U.S. 378, 404 (1965)) ("Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field."). Furthermore, because the Article was published to at least one reader in Canada—who understood it as referring to RTA and Dr. Nicolosi—the alleged tort also would have occurred in Canada (in addition to California). As such, the Court would likely find it unreasonable to hale Defendants to Court in California.

**C. <u>Jurisdictional Discovery</u>**

"Jurisdictional discovery should be permitted 'where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary.'" *Burri L. PA v. Skurla*, 35 F.4th 1207, 1217–18 (9th Cir. 2022) (quoting *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008)). "However, '[w]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by defendants, the Court need not permit even limited discovery....'" *Hall-Magner Grp. v. Firsten*, No. 11-cv-00312-JLS-POR, 2011 WL 5036027, at *7 (S.D. Cal. Oct. 24, 2011) (quoting *Terracom v. Valley Nat'l Bank,* 49 F.3d 555, 562 (9th Cir.1995)).

Plaintiffs state that "[d]iscovery into jurisdictional issues is permitted if it appears that the plaintiff will be able supplement its jurisdictional allegations through discovery." Oppo. I at 17 (citing *GTE New Media Services Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351–52 (D.C. 2000)). Plaintiffs later state that "[t]o the extent the court believes

additional facts are needed to establish jurisdiction, Plaintiffs should be permitted to conduct discovery into this issue." Oppo. I at 31; Oppo. II at 34. Despite Plaintiffs' passive request that the Court permit jurisdictional discovery, Plaintiffs make no showing of what they hope to discover. In fact, Plaintiffs fail to make any additional arguments respecting jurisdictional discovery whatsoever. For this reason alone, the Court could deny Plaintiffs' request. *Cf. AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1213 (9th Cir. 2020), *cert. denied*, 211 L. Ed. 2d 13, 142 S. Ct. 76 (2021) (quoting *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020)) (stating in its analysis regarding jurisdictional discovery that the Court "rel[ies] on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").

Additionally, the Court finds no basis on which to allow jurisdictional discovery. Plaintiffs' Complaint concedes that the conduct giving rise to the supposed defamation occurred in Canada, and although Plaintiffs allege that Defendants ***caused*** the Article to be published (and ultimately distributed in California), the Complaint alleges, and the Oppositions concede, that BMC was the publisher. Compl. at 10, ¶ 20. If BMC were a defendant in the matter, jurisdictional discovery might be appropriate to determine whether its online publication of the Article sufficiently targeted California (*e.g.*, the Article's distribution in California, the number of subscriptions in the state, figures on advertisement revenues, etc.). However, BMC is not a defendant and the few relevant contacts that do exist between the named Defendants and California do not appear to be in dispute. Plaintiffs' Oppositions urge the Court to give more weight to those contacts than permitted under *Walden* and to consider BMC's contacts with California in determining jurisdiction over Defendants. The Court already rejected this argument as explained *supra*. Furthermore, the Court has reviewed the Article and found that in authoring it, Defendants did not expressly aim their conduct at Plaintiffs and/or California. The Article itself will not change during jurisdictional discovery, nor will the fact that BMC published it. Accordingly, the Court **DENIES** Plaintiffs' request for jurisdictional discovery.

**D. Anti-SLAPP Motion and Rule 12(b)(6) Arguments**

As established above, the Court does not have personal jurisdiction over Defendants and therefore, lacks jurisdiction to decide Defendants' remaining Motions and arguments. Accordingly, the Court **DENIES** as moot: (1) Dr. Salway's Anti-SLAPP Motion; (2) Kinitz's Anti-SLAPP Motion; (3) Dr. Salway's Rule 12(b)(6) arguments; (4) Kinitz's Rule 12(b)(6) arguments; and (5) Kinitz's arguments regarding improper service of process. In addition, the Court **OVERRULES** Dr. Salway's objections to Plaintiffs' extrinsic evidence supporting their Opposition, because the Court does not require the evidence to resolve Dr. Salway's Motion to Dismiss.[10]

## V. CONCLUSION

For the reasons set forth above, the Court **ORDERS** the following:

1. Dr. Salway's Motion to Dismiss for Lack of Personal Jurisdiction is **GRANTED** *without prejudice*.

2. Kinitz's Motion to Dismiss for Lack of Personal Jurisdiction is **GRANTED** *without prejudice*.

3. Dr. Salway's Anti-SLAPP Motion is **DENIED** as moot.

4. Kinitz's Anti-SLAPP Motion is **DENIED** as moot.

5. Plaintiffs' *Ex Parte* Application to Bifurcate is **DENIED** as moot.

**IT IS SO ORDERED.**

DATED: September 26, 2022

**HON. ROGER T. BENITEZ**
United States District Judge

---

[10] The evidence fails to establish the required contacts between Defendants and California.